The **NATIONAL BANK OF COMMERCE IN NEW ORLEANS, Plaintiff,**

v.

**FIDELITY AND CASUALTY COMPANY OF NEW YORK, the Travelers Indemnity Company, Firemen's Fund Insurance Company, Defendants.**

**Civ. A. No. 69–848.**

United States District Court,
E. D. Louisiana,
New Orleans Division.

April 10, 1970.

Merrill T. Landwehr, John V. Baus, New Orleans, La., for plaintiff.

Stanley E. Loeb, New Orleans, La., for defendants.

Sidney M. Bach, New Orleans, La., for defendant-intervenor.

RUBIN, District Judge:

### I. FINDINGS OF FACT

Hughes Walsh, a contractor, had lots of bills and no money. It had accounts in a Dallas bank and a New Orleans bank, so it resorted to a classic method of robbing Peter to pay Paul: on September 10, 1968, it drew a check for $87,450 on the New Orleans bank and deposited it in the Dallas bank. It drew a check for $87,500 on the Dallas bank and deposited it in the New Orleans bank. It thus created the illusion that it had money in both banks. Then, to pay its bills, it wrote checks against the image of solvency it had created in Dallas. The check drawn on the New Orleans bank was deposited in Dallas on September 11. The check drawn on the Dallas bank was received for deposit by the New Orleans bank on September 12.

Meanwhile the check drawn on the New Orleans bank was presented to it by the Dallas bank on September 13. This was paid because the New Orleans bank failed to discover that the check deposited with it had not yet been honored. That check had been sent to the Federal Reserve Bank in Dallas for clearance. But, as a result of an intervening weekend and other events, the New Orleans bank was not notified until September 18 that the check deposited with it had not been

honored because the customer had insufficient funds on deposit in Dallas.

Thus the check kite was launched, and it flew. When Hughes Walsh wrote the check on the Dallas bank, it had an overdraft there of approximately $55,000.00; at the same time the balance in its New Orleans account was only $611.00.

The New Orleans bank had a Bankers Blanket Bond issued by the defendants and three other surety companies, who are not sued. It claims its loss was covered by clause B of that bond, which reads:

### "ON PREMISES

(B) Any loss of Property through robbery, burglary, common-law or statutory larceny, theft, false pretenses, hold-up, misplacement, mysterious unexplainable disappearance, damage thereto or destruction thereof, whether effected with or without violence or with or without negligence on the part of any of the Employees, and any loss of subscription, conversion, redemption or deposit privileges through the misplacement or loss of Property, while the Property is (or is supposed to be) lodged or deposited within any offices or premises located anywhere, except in an office hereinafter excluded or in the mail or with a carrier for hire, other than an armored motor vehicle company, for the purpose of transportation."

The bonding companies say this was not a loss occasioned by false pretenses because Hughes Walsh expected the Dallas bank to honor the overdraft and pay the check that had been deposited in New Orleans, or because Hughes Walsh believed it would be able to deposit funds in Dallas sufficient to cover the check before it was presented for payment. Even if Hughes Walsh did make deliberate misrepresentations to the New Orleans bank, the bonding companies contend the false pretenses were made off the bank's premises, so that the loss would be excluded from coverage under clause B. Alternatively, they urge that the transaction was in fact a loan, excluded from policy coverage.

There is no evidence to support the claim that Hughes Walsh in fact acted in reliance on the assumption that the Dallas bank would honor its overdraft. That bank had done so on many occasions in the past, but Hughes Walsh had no reason to believe that it would honor the $87,500 overdraft this time, particularly since the Dallas account was already $55,000 in the red. In addition, Clifford E. Hughes, the president and principal stockholder of Hughes Walsh, testified that he signed the check deposited in New Orleans because, "We expected to get money from receivables that people owed us." Had he been confident that the Dallas bank would pay overdrafts, there would have been no reason to create the false fund in it by depositing a check drawn on the New Orleans bank: it would have been simpler and easier merely to draw the checks to pay Hughes Walsh's creditors directly on the Dallas account. Instead, as Hughes admitted, the New Orleans check was deposited in the Dallas bank for the express purpose of creating an artificial credit in the Dallas checking account.

Hence Hughes Walsh engaged in a deliberate effort to make the New Orleans bank believe that the Dallas bank would honor its check. Hughes testified that he was buying time. But he didn't pay anything for it.

I cannot credit Hughes' statement that he trusted money would be forthcoming from accounts receivable. He testified that only a garnishment, issued by a company involved in another litigation, prevented the expected payments. The only testimony to this effect is his own, and no other credible evidence supports it. I am convinced he had no sincere expectation that was defeated at the last minute by the garnishment, but rather that he was engaging in a fruitless day to day effort to gain more time.

## II.  CONSTRUCTION OF THE BOND

■ The plaintiff has urged that the bond should be construed adversely to the insurers.  The bonding companies say this was not a unilaterally composed document, and the rule of hostile construction should not be applied.

In fact the form of Broker's Bond involved here resulted from the joint efforts and negotiations of the American Bankers Association and the Surety Association of America.  There is no need to apply any rule of construction applicable only to ambiguities because the language of the bond is clear.  It need be read with neither favoritism to one party nor severity toward the other.

## III.  DID THE LOSS RESULT FROM FALSE PRETENSES?

■ The bond covers any loss through "false pretenses."  This phrase has been interpreted by the courts as including losses sustained by a bank through check kiting.  By presenting the check to the New Orleans bank, the customer represented that it was drawn against an account with sufficient funds.  Since it knew at the time that it did not have enough money to cover the check, the customer was deliberately using a false impression—a "pretense"—so that it could draw on the artificial credit created in the New Orleans bank.  That pretense caused the bank to sustain this loss.  See Hartford Accident and Indemnity Co. v. Federal Deposit Insurance Corp., 8 Cir. 1953, 204 F.2d 933; Fidelity and Casualty Company v. Bank of Altenburg, 8 Cir. 1954, 216 F.2d 294; United States for use of First Continental National Bank & Trust Co., Lincoln, Nebraska v. Western Contracting Corporation, 8 Cir. 1965, 341 F.2d 383; United Pacific Insurance Co. v. Idaho First National Bank, 9 Cir. 1967, 378 F.2d 62; Indemnity Insurance Co. of North America v. Pioneer Valley Savings Bank, 8 Cir. 1965, 343 F.2d 634.

It is argued that these cases are so distinguishable on their facts from the case at bar that their holdings are irrelevant.  This is to insist that to apply *Palsgraf* we must find scales in a depot.  In all the cases the courts found that obtaining funds or credit from banks through the knowing circulation of worthless checks amounted to "false pretenses," and that the banks' resultant losses were covered by the Bankers' Blanket Bond.  Although the details of the check kiting operations vary from case to case, the logic of the opinions is both pertinent and persuasive.  See also Liberty Nat. Bank & Trust Co. v. Travelers Indemnity Co., 1968, 58 Misc.2d 443, 295 N.Y.S.2d 983, and Annotation (1951), Insurance of bank against larceny and false pretenses, 15 A.L.R.2d 1006.

This diversity case turns on Louisiana law.  But the principles appear to be no different from those of Missouri, as applied by the Eighth Circuit in Fidelity and Casualty Company v. Bank of Altenburg, *supra:*

"Check kiting, as practiced here, involves more than the mere use of the check with insufficient funds in the bank to meet it.  It involves a series of acts which together constitute a scheme, a studied device, false pretenses built upon a series of false representations designed to lull the banks involved into a feeling of confidence and security.  The bad check is given.  Money or credit is received from a bank other than the one on which the check is drawn.  If credit is taken, that credit is usually drawn upon immediately.  The check kiter then deposits a check in the bank upon which the first check is drawn before the first check arrives there.  The second check is drawn on the bank from which the first money or credit is received.  Credit is taken from it and that credit covers the first check when it comes in and possibly additional credit." 216 F.2d at 302.

Louisiana's criminal law prohibits the knowing issuance of worthless checks.  LSA–R.S. 14:71.  The statute creates a presumption that intent to defraud exists when the offender fails to pay a check

within 10 days after he has been notified of its nonpayment. This is, of course, rebuttable. Blue Bonnet Creamery, Inc. v. Gulf Milk Association, La. App.1965, 172 So.2d 133. It is inappropriate to discuss here whether a violation of Louisiana's criminal law has occurred; but it is clear that the issuance of checks knowing they are worthless is in general condemned by Louisiana law.

Nor was Hughes himself an innocent lamb who guilelessly signed checks that turned out unhappily but unintentionally to be worthless. While he was getting the Dallas-New Orleans kite up in the air, he was also flying one between a bank in Baton Rouge and the same Dallas bank involved in the exchange of checks that caused the loss in this case.

"The bond does not define the term 'false pretenses,' " the court said in United States v. Western Contracting Corporation, *supra*. But, as it continued, "It seems clear that the coverage of an item such as false pretenses is at least as broad as the criminal definition of the term."

For these reasons, the conduct of Hughes Walsh with respect to the New Orleans bank is held to constitute "false pretenses," as that phrase is used in the bond.

## IV. THE "LOAN" EXCLUSION IS NOT APPLICABLE TO A CHECK KITING SCHEME

■ The argument that the New Orleans bank was making a loan when it honored the check drawn on it, and hence that the bond doesn't cover its loss, will not bear analysis. Certainly Hughes Walsh owes the bank money. But the New Orleans bank can no more be said to have made a loan to him than it could be said to lend money to an embezzler. The policy exclusion contemplates a lending transaction knowingly entered into by the bank in reliance on the customer's express agreement to repay, most often for the purpose of making a profit on the interest.

In National Bank of Paulding v. Fidelity & Casualty Co., S.D.Ohio 1954, 131 F.Supp. 121, the bank had sustained losses because of its reliance on fictitious documents. Rejecting the argument that the funds had been advanced as a "loan," the court noted that a loan is a consensual contract whereby one person advances money to another and the other agrees to repay it upon certain terms as to time and rate of interest, and that, in order to have a contract of this type, "There must be a meeting of minds," 131 F.Supp. at 123–124.

We agree with the court in Hartford Acc. & Indem. Co. v. Federal Deposit Ins. Co., *supra*, 204 F.2d at 937, that "It is not conceivable * * * that any disinterested banker, insurance underwriter, or lawyer would construe the word 'loan' as used in the exclusion clause of this indemnity bond, to cover the obligation imposed by law to reimburse a bank for money or credit obtained through the use of worthless checks."

In that case losses from a check kite were held to have resulted from "false pretenses" rather than from a bad loan. The court stated:

"Contracts of insurance, like other contracts, must be construed according to the terms which the parties have used, to be taken and understood, in the absence of ambiguity, in their plain, ordinary, and popular sense." 204 F.2d at 937.

In its "plain, ordinary and popular sense," and as it has consistently been interpreted in the context of the Bankers' Blanket Bond, the word "loan" does not include money advanced in good faith on worthless checks.

See also, for cases specifically holding that credit advanced on kited checks is not a loan, Fidelity & Casualty Co. v. Bank of Altenburg, *supra*; United States v. Western Contracting Corp., *supra*; United Pacific Ins. Co. v. Idaho First Nat'l Bank, *supra*; Pioneer Valley Savings Bank v. Indemnity Ins. Co. of North America, *supra*.

## V. DID THE LOSS OCCUR OFF THE PREMISES?

■ Clause B of the bond covers losses of property only "while the Property is (or is supposed to be) lodged or deposited within any offices or premises. * * *" It would be meaningless, in our credit economy, to debate the question of where the actual *money* represented by a bank's check is located, and defendant does not argue that the "property" lost when Hughes Walsh's checks turned out to be worthless was off the premises when the loss occurred.

Defendant maintains, however, that because clause B is entitled "ON PREMISES," all of the items mentioned therein must have occurred on the premises of the insured in order to be covered; it then contends that any "false pretenses" involved in the instant transactions were made off the premises, and that the losses are therefore not recoverable. Even assuming the "on premises" requirement does apply to "false pretenses" as well as to "property," the argument that the misrepresentation of the solvency of Hughes Walsh's Dallas account was not made at the New Orleans bank is fanciful.

Hughes mailed a deposit from Dallas to the New Orleans bank. He intended the New Orleans bank to believe the check was good when the New Orleans bank received it, and his expectation was borne out. The act of depositing it in New Orleans constituted a false representation there. See Fidelity and Casualty Company v. Bank of Altenburg, *supra.* The loss occurred on the bank's premises in New Orleans.

## VI. PENALTIES AND ATTORNEY'S FEES

■ Plaintiff requests the penalties prescribed by LSA–R.S. 22:658 be imposed on defendant for its allegedly unreasonable failure to pay plaintiff's claim within 60 days after receipt of proof of loss. However, it has not been established that defendant's refusal to pay was, in the words of the statute, "arbitrary, capricious, or without probable cause." Although defendant's interpretation of the bond coverage had been rejected by a number of courts, it was not wholly unrealistic or frivolous. Moreover, on the facts, there was at least superficial logic to Hughes' explanation. Although I do not credit it, the bonding company was not whimsical in doing so, particularly since it had not had the benefit of a full adversary hearing before it had to decide whether to accept Hughes' version of the events. Hence, the claim for penalty fees is rejected.

■ But in addition to the penalty imposed by LSA–R.S. 22:658, LSA–R.S. 9:3902 provides:

"If the surety on a bond fails to pay his obligation and it becomes necessary for the creditor to sue thereon, the latter shall be entitled to ten per cent attorney's fees on the amount recovered, provided he has employed an attorney for the purpose, has made written amicable demand on the principal and surety and thirty days have elapsed from their receipt thereof without payment being made, and the full amount claimed in the demand is recovered."

The words of this statute are both unconditional and mandatory. More than 30 days have elapsed since defendants have received plaintiff's written demand for payment of its claim. When payment was not made by defendants it became necessary for plaintiff to employ an attorney for the purpose of enforcing its claim. I have granted judgment for the full amount claimed. As a result, plaintiff is entitled to ten percent of the amount recovered as attorney's fees. See Bankston v. Loranger Milk Plant, 1944, 205 La. 290, 17 So.2d 332; Fidelity Homestead Assn. v. Kennedy & Anderson, 1925, 158 La. 1059, 105 So. 64; Apex Sales Co. v. Abraham, La.App.1967, 201 So.2d 184.

## CONCLUSION

Accordingly the Clerk will enter judgment for the plaintiff:

against the defendant, Fidelity & Casualty Company of New York, in the sum

of $17,618.35, plus 10% additional as attorney's fees, plus legal interest from November 15, 1968;

against the defendant, The Travelers Indemnity Company, in the sum of $11,745.57, plus 10% additional as attorney's fees, plus legal interest from November 15, 1968;

against the defendant, Firemen's Fund Insurance Company, in the sum of $11,745.57, plus 10% additional as attorney's fees, plus legal interest from November 15, 1968.

There shall be judgment over, in favor of the defendants Fidelity & Casualty, Travelers, and Firemen's Fund, on their cross-claim against Hughes Walsh, Inc. and Clifford E. Hughes, defendants-intervenors.