**CLARENDON BANK & TRUST,**
Plaintiff,

v.

**FIDELITY AND DEPOSIT COMPANY OF MARYLAND, Defendant.**

**Civ. A. No. 296–75–A.**

United States District Court,
E. D. Virginia,
Alexandria Division.

Dec. 22, 1975.

Frank E. Brown, Jr., Thomas G. Mays, Arlington, Va., for plaintiff.

Alexander M. Heron and John C. Hayes, Jr., Washington, D. C., Fred C. Alexander, Jr., Alexandria, Va., for defendant.

## MEMORANDUM OPINION

CLARKE, District Judge.

Plaintiff, Clarendon Bank & Trust (CB&T), seeks recovery in the amount of $307,812.10 from defendant, Fidelity and Deposit Company of Maryland (F&D), alleging that a loss sustained as the result of allowing a customer to draw on deposits which were ultimately dishonored falls within the coverage of the Banker's Blanket Bond issued by F&D to CB&T. Plaintiff relies on Insuring Agreements B, loss of property through false pretenses, and D, loss through forgery, for recovery. Defendant alleges that the loss was not occasioned through a forgery, and so is not payable under Insuring Agreement (D) and that the definition of "Property" in Section 1(b) of the Bond refers only to tangible personal property, excluding this loss from coverage under Insuring Agreement (B) (Loss of property through false pretenses). Finally, F&D contends that any loss is excluded from coverage by virtue of the "check kiting" provision of Section 2(e) (Exclusions). Plaintiff claims F&D has not plead the loan exclusion portion of Section 2(e) and, therefore, that provision is not in issue.

This Court has jurisdiction by virtue of 28 U.S.C. § 1332. The parties agree that at all times pertinent to the issues herein the Bond was in full force and effect.

The stipulations of counsel and the evidence showed that on March 31, 1973, a checking account was opened at CB&T by a customer who, at the time pertinent to this case, was named Car Retailers and was a partnership consisting of Jule Williamson and F. L. Kitzmiller. Both partners dealt with the bank in making deposits, signing checks on the firm's account and in authorizing payment of drafts drawn on Car Retailers for automobiles purchased by the firm.

Car Retailers would buy used automobiles at "wholesale" and would in turn sell them to other dealers. When Car Retailers purchased automobiles at an auction, a draft would be accompanied by title certificates to the automobiles and would be presented to CB&T for payment from Car Retailers' account.

Sometime before January 1, 1974, Car Retailers worked out a system of financing or "floor planning" its purchases with Richardson's Used Cars, Inc., of Bladenboro, North Carolina. Under the system adopted to implement this plan, Richardson furnished Car Retailers with blank checks which Mr. Williamson, of Car Retailers, would fill out for a given amount, list on the check the cars being financed and would sign the name of Jerry Richardson, Richardson's President, to the check and would place his initials J. W. by the signature. Car Retailers would mail the title certificates for the automobiles involved to Richardson's bank in Bladenboro so that they could be checked against the listing on the check when it was presented for payment. For this financing service, Richardson received a fee.

CB&T thought the Richardson checks being deposited by Car Retailers to its account represented proceeds from the *sale* of the automobiles by Car Retailers to Richardson and was unaware that the transactions were for the purpose of financing Car Retailers' purchases.

The practice at CB&T was that Mr. Kitzmiller, partner in Car Retailers, would call on Mr. Paul Schumacher, Executive Vice President of CB&T, with a deposit made up of checks from various sources. Prominent among those checks, both as to number and amount, were those drawn on Richardson's Account at the Bladenboro, North Carolina, bank. Mr. Schumacher would add up the deposit and would be told by Mr. Kitzmiller what drafts which had been drawn by others on Car Retailers for its purchases should be paid from the funds so deposited. Mr. Schumacher would then "sight post" the deposit and would thereby commit CB&T to pay the drafts selected and would allow Mr. Kitzmiller to take the certificates of title to the automobiles which had accompanied the drafts. Thus, Mr. Schumacher was committing the bank to make payments on uncollected funds.

All went well with this scheme until the automobile business began to slow up and Richardson advised Car Retailers that it would no longer "floor plan" or finance Car Retailers' acquisitions. Richardson advised Car Retailers that it would accept checks drawn on its account pursuant to the finance scheme through December 31, 1973, and it in fact did so.

Despite the cancellation of his authority, Jule Williamson continued to draw checks on Richardson's account after January 1, 1974, signing Jerry Richardson's name with the added initials "J. W." These checks continued to be a part of Car Retailers' deposits taken to Mr. Schumacher at CB&T by Kitzmiller and Mr. Schumacher continued to accept them and commit the bank to payments of drafts with these uncollected items.

For some unexplained reason, Richardson's bank in Bladenboro failed to notify CB&T that the checks in question were not being honored until around the middle of January by which time $347,163.00 in unpaid Richardson checks had been sight posted to Car Retailers' account and had been committed by CB&T to be paid out. Unfortunately, when the Bladenboro bank refused to accept the checks, it sent most of the titles to the automobiles that it had received in support thereof back to Car Retailers rather than to CB&T. Car Retailers did not turn the titles or the proceeds from the sale of the automobiles they represented over to CB&T.

CB&T salvaged some of its loss by securing the titles to some of the automobiles in question and selling the automobiles. Its net loss was $307,812.10 for which it makes claim against the defendant.

From these facts, the Court must determine if Car Retailers or Jule William-

son was guilty of *Forgery* as contemplated in the policy or, if not, was "property" taken from CB&T by *False Pretenses* as contemplated in the policy. The Court must also determine if CB&T's claim is barred by Exclusion 2(e) of the bond as being a "check kiting" scheme.

Initially, plaintiff argues that any ambiguous provisions of insurance policies must be construed against the insurer as a matter of law. This issue has particular significance because of the disputed interpretations of certain clauses in the bond at issue in this case. Defendant contends that the theoretical underpinning of the maxim of interpretation of insurance policy against the insurer is not applicable here. The bond involved in the instant matter is a standard form utilized in the banking industry. The bond was the result of "four years of study and collaboration between the American Bankers Association and the Surety Association of America." In light of the fact that industry representatives jointly drafted the bond, the defendant concludes that the policy should not be interpreted against either party. Accordingly, in defendant's view, the intent of the parties controls when ambiguities arise.

Both parties have failed to discuss decisions addressing the significance that should be attached to the ABA's participation in approving the standard form bond. Ironically, both parties have cited these cases for other propositions in their briefs but they neglect to do so for this point. At least three courts have considered the question. In *National Bank of Commerce in New Orleans v. Fidelity & Casualty Company of New York,* 312 F.Supp. 71 (E.D.La.1970), *affirmed,* 437 F.2d 96 (5th Cir. 1971), Judge Rubin decided that because the bond resulted from the joint efforts of the two professional organizations, the bond should not be applied hostilely against the insurer. An Alabama District Court disagrees. That Court recognized that the bond was the efforts of the two organizations but concluded that

"this record is absent any evidence that this plaintiff or any association acting for it negotiated the language of the bankers' blanket bond here in question." *Shoals National Bank of Florence v. Home Indemnity Company,* 384 F.Supp. 49 (N.D.Ala.1974). This Court finds the Seventh Circuit's rationale most compelling in *First National Bank of Decatur v. Insurance Company of North America,* 424 F.2d 312 (7th Cir.), *cert. denied,* 398 U.S. 939, 90 S.Ct. 1844, 26 L.Ed.2d 272 (1970). Under the Circuit Court's analysis, the defendant would have to prove that CB&T participated in drafting the bond. The record is barren of such evidence. Additionally, the revised bond in April, 1969, issued to CB&T merely states that changes occurred "in collaboration with" the ABA. Although the plaintiff was a member of the ABA, the defendant has failed to establish the depth of the plaintiff's participation in drafting the revisions.

Therefore, concurring with the Seventh Circuit's decision, the Court will follow the general rule, in case of ambiguity the terms of an insurance policy should be interpreted against the insurer.

The first issue confronting the Court is whether the signature of Jerry Richardson by Jule Williamson constitutes forgery within the bond provisions, which provide merely that the bank shall be indemnified and held harmless from loss through forgery of any checks. The parties agree that Mr. Williamson signed Mr. Richardson's name with authority from March, 1973 to December, 1973 (Stipulation # 5). Williamson was provided with printed forms of checks bearing the name of Richardson's corporate entity. (Stipulation # 5)

These check forms were used to deposit funds into the CB&T account of Car Retailers, the partnership account of Jule Williamson and F. L. Kitzmiller. (Stipulation # 3) All the checks in dispute concern deposits made in January, 1974. These checks were signed Richardson's Used Cars, Inc., by Jerry Richardson. (Stipulation # 5) Below the

signature of Jerry Richardson, the initials "J. W." appeared within a circle. The initials "J. W." were those of Jule Williamson, who, in fact, signed Mr. Richardson's name to each check deposited in January of 1974. (Stipulation # 5) Richardson's policy of authorizing Mr. Williamson to sign his name terminated in December of 1973.

The Court must decide whether the actions of Jule Williamson constitutes forgery. If these actions are deemed to be a "forgery," then it must be determined whether this loss is excludable under Section 2(e) of the bond. Plaintiff argues that Williamson's acts were forgery and that the definition of forgery should be as broad as the criminal definition. Plaintiff avers that the situation at bar falls within the purview of the definition of forgery under the Virginia case law.

Defendant relies upon *Gilbert v. United States,* 370 U.S. 650, 82 S.Ct. 1399, 8 L.Ed.2d 750 (1962) for the proposition that this is a signature *per procuration* and not a forgery.

▆▆▆ The bond in controversy does not define "forgery." The Court must therefore resort to other definitional sources. In *Gilbert,* the Supreme Court traced the common law historical definition of forgery as employed in 18 U.S.C. § 495. The English case of *Regina v. White,* 2 Car. & K. 404, 175 Eng.Rep. 167 (Nisi Prius, Book 6) (1847), contains the seminal definition of forgery for our purposes in the case at bar. The English court held that "indorsing a bill of exchange under a false assumption of authority to indorse it per procuration, is not forgery, there being no false making." 2 Car. & K. at 412, 175 Eng.Rep., at 170 (Nisi Prius, Book 6). The Supreme Court found that this "same view of forgery has since been followed in most of the state and federal courts in this country." *Gilbert v. United States,* 370 U.S. 650, 657, 82 S.Ct. 1399, 1403, 8 L.Ed.2d 750 (1962). From the common law perspective, forgery does not include an agency endorsement. Therefore, the Court concluded that "[w]here the 'falsi-

ty lies in the representation of facts, not in the genuineness of execution.' it is not forgery." *Gilbert v. United States,* 370 U.S. 650, 658, 82 S.Ct. 1399, 1404, 8 L.Ed.2d 750 (1962), *citing Marteney v. United States,* 216 F.2d 760, 763–764 (10th Cir. 1954). The Court concludes *Gilbert v. United States* and its progeny are controlling in the instant matter.

Although the Supreme Court in *Gilbert* was dissecting the word "forgery" as employed in a federal criminal statute, the Court believes that the common law meaning is the same for purposes of interpreting of the bond provisions in the instant case. The fundamental issue is whether the checks of Richardson's Used Cars, Inc., signed by Jule Williamson established an agency relationship. In *Gilbert,* the defendant endorsed the names of the payees and his own name followed by the word "trustee." This co-signing establishes the agency relationship. The *Gilbert* court explicitly affirmed the Tenth Circuit decision in *Selvidge v. United States,* 290 F.2d 894 (10th Cir. 1961). The Court of Appeals held that:

> "It is a rule of general application that an agent may commit forgery by making or signing an instrument in disobedience of his instructions or by exceeding his authority. But when she added her genuine signature purporting to endorse the checks as the agent of her named principal, although she had no authority to do so, she was not guilty of forgery."
> *Selvidge v. United States,* 290 F.2d 894, 895 (10th Cir. 1961)

▆▆▆ The facts in this case present a close question. The Court believes that the initials "J. W." appearing upon all the checks establishes the necessary agency relationship to take this case outside the ambit of forgery. The regularity of deposits in the preceding nine months solidify the conclusion that Williamson was operating in an agency relationship. According to the stipulations, Richardson withdrew authority to utilize his checks in December. The actions of

Williamson attempted to perpetuate the agency relationship in January of 1974. The Court recognizes that *Gilbert* and *Selvidge* contained the party's full name and in the former, the signature was modified by the word "trustee." However, in *Asher v. United States,* 480 F.2d 580 (6th Cir. 1973), the Court held that the lack of a qualifying adjective after the name does not deny the applicability of *Gilbert.* The Sixth Circuit stated that "the wrongful endorsement must be viewed as an 'agency endorsement,' however fraudulent." *Asher v. United States,* 480 F.2d 580, 583 (6th Cir. 1973). The fact that the plaintiff was not necessarily aware of the agency does not alter the result. Plaintiff was ostensibly given notice by the signature accompanied by the encircled initials. Although *Gilbert* involved a fraudulent endorsement, the fact that the instant checks contained an improper drawer signature does not militate a different conclusion. A similar sign of agency was provided to the plaintiffs in this case.

The eminent Judge Frederick van Pelt Bryan discussed the theoretical explanation behind the conclusion that forgery does not exist in agency situations shortly after the Supreme Court's decision in *Gilbert.* He opined:

> "The rationale of the cases holding that true agency endorsements do not constitute forgery under the common law is that when an agent adds his own signature to that of his principal even though he had no authority to do so, the instrument and the endorsement thereon are no different from what they purported to be."

> *United States v. Wilkins,* 213 F.Supp. 332, 337 (S.D.N.Y.1963), *aff'med* 328 F.2d 120 (2d Cir. 1964)

The Court finds as a fact and concludes as a matter of law that Jule Williamson acted in an agency relationship although he did not have authority to act in said manner. Cf. *Torrance National Bank v. Aetna Casualty & Surety Co.,* 251 F.2d 666 (9th Cir. 1958). The initials and prior transactions are suffi-

cient to establish the appearance of agency.

Authorities cited by the plaintiff are not persuasive. Although the Court has used the criminal definition of "forgery" in its analysis, neither *United States ex rel. First Continental National Bank & Trust Co. v. Western Contracting,* 341 F.2d 383 (8th Cir. 1965) nor *Provident Trust Co. v. National Sur. Corporation,* 138 F.2d 252 (3rd Cir. 1943) suggest that forgery should be defined "at least" as broad as the criminal definition. In fact, these cases discuss the breach of "false pretenses" rather than "forgery." Plaintiff's reliance upon the Virginia definition of forgery is unconvincing in the instant matter. Although this Court applies Virginia law in diversity actions, the Virginia authorities do not address purported agency relationship in the context of forgery. Furthermore, neither case cited by the plaintiff provides the comprehensive historical overview of the elements of forgery at common law as detailed in *Gilbert.*

Therefore, the Court finds that the January banking transactions between CB&T and Car Retailers did not constitute forgery within the bond's provisions. Plaintiff is denied recovery under the forgery section of the bond. Considering this disposition, it is not necessary to determine whether, under the forgery cause of action, this loss is excludable under Section 2(e) of the bond.

Plaintiff's alternative theory of recovery is that the actions of Car Retailers Inc., constituted false pretenses. Plaintiff argues that under Insuring Agreement B, these monies are recoverable in the category of loss of property through false pretenses. The policy reads as follows:

### "ON PREMISES

"(B) Loss of Property (occurring with or without negligence or violence) through robbery, burglary, common-law or statutory larceny, theft, false pretenses, hold-up, misplacement, mysterious unexplainable disappearance, damage thereto or destruction thereof,

and loss of subscription, conversion, redemption or deposit privileges through the misplacement or loss of Property, while the Property is (or is supposed to be) lodged or deposited within any offices or premises located anywhere, except in an office listed in Item 4 of the Declarations or amendment thereof or in the mail or with a carrier for hire, other than an armored motor vehicle company, for the purpose of transportation."

Car Retailers' conduct (i. e. knowledge that the January checks would not be honored) is pointed to as evidence of the partnership's fraudulent intent. An additional fact supporting said intent is the Car Retailers' retention of the titles and proceeds from the sale of the automobiles in question after the checks had been dishonored.

Defendant does not deny directly that false pretenses occurred. Rather, defendant proposes that any losses incurred by the plaintiff were not "property" on the premises within the terms of the bond agreement. In defendant's opinion, the 1969 industry-wide changes and revisions of the bond agreement now limit the definition of "property" to mean tangible items.

The Court's first task is to determine whether the passing of Richardson's Used Cars, Inc. checks to the plaintiff was false pretenses. If the Court so concludes, it must decide whether the bond exclusion provisions are applicable. This necessitates a determination of whether the result of these transactions was the exchange of "property" within the parameters of the bond definition of that word. If the Court finds that this amounted to false pretenses and the exchange is within the "property" definition, then the Court must decide whether this transaction is excluded under the bond provision proscribing bank payments against uncollected items. Concomitant with this decision is whether the uncollected items exclusion applies to situations other than check kiting schemes. The last issue is whether the

"within the office of the insured" exception to the payments against uncollected items exclusion is viable in the instant circumstances.

The bond does not define "false pretenses." Plaintiff suggests that the definition should be at least as broad as the criminal definition. Defendant does not discuss the definitional issue. Considering this case is brought under the Court's diversity jurisdiction, 28 U.S.C. § 1332, the Court is obliged to apply the Virginia substantive law under the dictates of *Erie v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). The applicable Virginia criminal statute does not define "false pretenses." § 18.2–178 Code of Virginia (1950, as amended). The Virginia Supreme Court has defined "false pretenses" in the following manner:

> "The false representation of a past or existing fact, whether by oral or written words or conduct, which is calculated to deceive, intended to deceive, and does in fact deceive, and by means of which one person obtains value from another without compensation."

*Hubbard v. Commonwealth,* 201 Va. 1, 109 S.E.2d 100 (1959), *citing* 35 C.J.S. False Pretenses § 1 at 636. *See also* 16 *Words & Phrases,* 240 et seq. (1959)

Reliance upon the Virginia criminal statute does not suggest that the conduct of the perpetrators of the false pretenses must rise to the level of a crime before it be deemed false pretenses. Typically, the Court's construction and interpretation of a criminal statute is precise and narrow. This Court is not as constrained in this case as it would be if it was making a guilt finding of false pretenses in the criminal milieu. The Court does not feel compelled to decide that each element of false pretenses is fulfilled with certainty and beyond a reasonable doubt. *See, e. g. First National Bank of Decatur v. Insurance Company of North America,* 424 F.2d 312 (7th Cir. 1970); *Pioneer Valley Savings Bank v. Indemnity Insurance Co.,* 225 F.Supp. 404 (N.D.Iowa 1964), *affirmed,* 343 F.2d 634 (8th Cir. 1965).

■ The Court finds that the actions of Car Retailers, Inc., fall within the ambit of the definition of false pretenses. Car Retailers' authority to utilize the checks of Richardson's Used Cars, Inc., had been withdrawn in December of 1973. Car Retailers' knowledge of the withdrawal of authority is uncontradicted. In the process of employing of checks for deposit, Car Retailers represented to the plaintiff that these checks represented funds on account for its business. The deposit of Richardson's Used Cars, Inc. checks was unequivocally intended to deceive and did, in fact, deceive. Car Retailers received plaintiff's monies as a result of these deceptions. On an almost daily basis, Mr. Kitzmiller, of Car Retailers, personally brought checks to the plaintiff and represented them to have full support of the drawer. These representations were part of Car Retailers' scheme to extract funds from Richardson's Used Cars, Inc. or CB&T without authorization. Since Car Retailers was cognizant at the time of the deposits that the checks would not be covered, the customer was deliberately using a false impression—a "pretense"—to defraud the bank. *National Bank of Commerce in New Orleans v. Fidelity and Casualty of New York,* 312 F.Supp. 71, 74 (E.D.La.1970). In reliance on the deposits of Richardson's Used Cars, Inc. checks, the plaintiff issued Treasurer's checks in payment of drafts and released to Car Retailers the automobile certificates of title.

Finally, in *United States v. Wilkins, supra,* the Court concluded that although the circumstances did not constitute forgery because of the agency relationship, the circumstances were sufficient to constitute false pretenses. *Wilkins, supra,* at 337. The Court finds this logic persuasive in the instant case. The actions of Car Retailers, Inc. is sufficient to fulfill the elements requisite to be considered false pretenses. In light of these facts, the Court finds that these activities are sufficient to come within the false pretenses provisions of the bond.

The Court must now decide whether the funds fall within the bond's definition of "property." Property is defined as:

"Money (i. e., currency, coins, bank notes, federal reserve notes), postage and revenue stamps, U.S. savings stamps, bullion, precious metals of all kind and in any form and articles made therefrom, jewelry, watches, necklaces, bracelets, gems, precious and semi-precious stones, bonds, securities, evidences of debt, debentures, scripts, certificates, receipts, warrants, rights, transfers, coupons, drafts, bills of exchange, acceptances, notes, checks, withdrawal orders, money orders, travelers' letters of credit, bills of lading, abstracts of title, insurance policies, deeds, mortgages upon real estate and/or upon chattels and upon interests therein and assignments of such policies, mortgages and instruments, and other valuable papers, including books of account and other records used by the insured in the conduct of its business and all other instruments similar to or in the nature of the foregoing in which the insured has an interest. . . ."

Section I(b), *Definitions,* Bond Agreement, Stipulation Exhibit A

■ Plaintiff contends that if the property definition was intended to be limited solely to tangible items, the bond would so state. Plaintiff believes that this argument is especially compelling in the light of the 1969 bond agreement revisions, which accordingly afforded defendant an opportunity to specify whether the property definition referred only to tangible items.

Defendant's attempt to limit the property definition to tangible items is not persuasive. The language of the bond must control absent ambiguity. The definition in the bond does not address only tangible items as indicated by the multiple number of items covered under the definition. The Court finds that the definition of property is broader than mere tangible items and may include the

type of losses suffered in this matter. The Court also concludes that if the "property" definition is ambiguous, it will be construed against the defendant.

■ Plaintiff contends that the losses include "rights" and that they possess "evidences of debt" both within the purview of the bond's definition. Plaintiff asserts additional losses associated with the transferring of the automobile certificates of title to the Bank of Bladenboro, North Carolina. The Court accepts plaintiff's characterization of property. Clearly, these items were of value and may be construed as "evidences of debt," "right(s)" and ultimately resulting in the making of "note(s)" and "check(s)." In light of this, the Court concludes that the instant losses fall within the purview of the bond's property definition.

Defendant points out that the changes of the definition of property by the American Surety Association were in response to the Seventh Circuit's analysis of the "property" definition in the case of *First National Bank of Decatur v. Insurance Company of North America,* 424 F.2d 312 (7th Cir. 1970), *cert. denied,* 398 U.S. 939, 90 S.Ct. 1844, 26 L.Ed.2d 272 (1970). The fact that the industry organization may have been motivated by the decision in *First National Bank of Decatur* does not detract from the unambiguous definition provided in the bond. The Court believes that the sole substantive change between the old and new bond's definition of "property" relates to segment delineating the meaning of money. In that context, the Association "clarified" the definition in the following manner:

"money (i. e. currency, coins, bank notes, federal reserve notes) . . ."

But for this alteration, the definition enumerates the same items as the pre-change definition. In *First National Bank of Decatur,* the Seventh Circuit discussed this argument:

"INA [defendant] claims that coverage (B) invoked here 'covers only tangible, "touchable", physically corporeal property and the loss of Plaintiff does not qualify.' The bond contains a lengthy definition of 'property' and includes in that term, among other things, the following: acceptances, bank notes, bills of exchange, bonds, certificates, checks, currency, drafts, evidences of debts, insurance policies, assignments of insurance policies, money, mortgages, receipts, rights, and withdrawal orders. *We find this list broad enough to include intangible as well as tangible property.*" (emphasis supplied) *Id.* at 315.

■ Under the dictates of this decision, the Court finds that although defendant's industry association partially changed the "property" definition, these changes did not result in narrowing the definition such that it only applies to tangible items. The Seventh Circuit concluded without equivocation that intangible items were covered within the definition. Additionally, the segment that the appeals court relied upon for this conclusion was not altered in the revisions. It should be reiterated that even if the term "property" is ambiguous on this point, it is decided against the defendant on the basis of the Court's earlier analysis. The losses experienced by the plaintiff are both of a tangible and intangible nature.

Therefore, the Court concludes that the losses involved in this suit may be classified within the definition of "property" as provided in Section I(b) of the bond. The Court finds that these losses were the type contemplated within the bond's provisions. Furthermore, the Court finds that the bond revisions did not effectuate the intended purpose by foreclosing recovery of intangible items within the property definition.

Defendant's final argument is that even if the Court finds false pretenses and that the funds constituted property, the instant losses are excludable under

Section 2(e) of the blanket bond agreement. Section 2(e) of the bond provides:

## "EXCLUSIONS

"Section 2. THIS BOND DOES NOT COVER:

"(e) loss resulting from the complete or partial non-payment of, or default upon,

"(1) any loan or transaction in the nature of, or amounting to, a loan made by or obtained from the Insured, or

"(2) any note, account, agreement or other evidence of debt assigned or sold to, or discounted or otherwise acquired by, the Insured

"whether procured in good faith or through trick, artifice, fraud or false pretenses unless such loss is covered under Insuring Agreement (A), (D) or (E); or loss resulting from payments made or withdrawals from any depositor's account by reason of uncollected items of deposit having been credited by the Insured to such account, unless such payments are made to, or withdrawn by, such depositor or representative of such depositor who is within the office of the Insured at the time of such payment or withdrawal, or unless such loss is covered under Insuring Agreement (A)."

This section was amended in April, 1969. Defendant contends that this provision is applicable in the instant circumstances. In defendant's opinion, plaintiff's sight posting of Richardson's Used Cars, Inc. checks effected authorization to draw against the uncollected funds immediately. As a result, any losses attributed to said posting and subsequent authorization are barred by Section 2(e) according to the defendant. A supplemental argument is that if these transactions are construed to be check kiting, the instant transactions fall within the definition of that word. Essentially, defendant asserts that in contrast to plaintiff's interpretation check kiting does not have a static meaning but rather is a fraud device aimed at playing deposits against the calendar. As support for its flexible definition theory, defendant cites cases showing that a check kiting scheme may involve as few as one bank and as many as three banks.

Plaintiff argues vehemently that Section 2(e) is fundamentally a check kiting exclusion and therefore, is inapposite the instant facts. The elements of a kite "are the establishment of two or more bank accounts in different banks by the same depositor and a constant back and forth movement of funds between the two or more accounts utilizing checks of approximately the same amount."

In Exhibit A, entitled "Analysis of Changes, Bankers Blanket Bond, Standard Form No. 24" (Revised to April, 1969), exclusion 2(e) is labeled a "check kiting" exclusion. According to Stipulation # 2, this analysis was prepared by the Surety Association of America. By the very language of the defendant's announcement, Section 2(e) is considered to be *the* check kiting exclusion. Although the Court is aware that analysis announcement contains a disclaimer at the bottom of the second and last page,[1] the Court recognizes that the analysis serves as an indicia of the intent of the Surety Association of America similar to the usage of legislative records and reports to ascertain the legislative drafters' intent. This analogy is not precisely on all fours because Exhibit A was drafted after the changes were decided upon whereas legislative history predates the legislation. Nevertheless, Exhibit A acts as a valuable indication of the industry organization's purpose behind Section 2(e) and the purported area of exclusivity.

This interpretation is fortified by the Protective Bulletin of the American Bankers Association, issued April, 1969, which labeled the uncollected items exclusion as one excluding protection for

---

1. "This analysis is intended to be informative only. The terms and provisions of this bond and riders will govern any question arising in connection therewith."

check kiting.[2] Interestingly, the defendant appears to concur with the label "check kiting" exclusion as witnessed by the citation without dissent of the ABA's Protective Bulletin describing the 1969 revisions to the Blanket Bond Agreement.

The Court finds that Section 2(e) of the Blanket Bond Agreement was intended to exclude coverage for check kiting. The Court must now determine whether this exclusion is applicable. Obviously, this necessitates a determination whether the instant losses were consummated as a result of a check kiting scheme. *See First National Bank of Miami v. Insurance Co. of North America,* 495 F.2d 519, 521 (5th Cir. 1974).

█ Relying upon *First National Bank of Miami v. Insurance Co. of North America,* 495 F.2d 519 (5th Cir. 1974), plaintiff argues that the exclusion is not applicable because it does not apply to forgeries. The Court has previously decided the forgery theory of recovery adversely to the plaintiff. Nevertheless, a survey of "check kiting" cases leads the Court to conclude that the instant circumstances do not rise to the level of check kiting. *See First National Bank of Decatur v. Insurance Co. of North America,* 424 F.2d 312 (7th Cir. 1970); *Fidelity & Casualty Company v. Bank of Altenburg,* 216 F.2d 294 (8th Cir. 1954); *Hartford Accident & Indemnity Co. v. Federal Deposit Insurance Corporation,* 204 F.2d 933 (8th Cir. 1953); *National Bank of Commerce in New Orleans v. Fidelity & Casualty Company of New York,* 312 F.Supp. 71 (E.D.La.1970). In each of these cases, two banks were involved and the kiting consisted of parlaying funds between two accounts in two distinct banks. The kite flies as a result of this shifting of funds between the two accounts and the gap time between the honoring of other bank's checks. This case is absent of any evidence of two accounts and corresponding banks. The Court accepts the testimony

of plaintiff's witnesses, Mr. Moore, a Vice-President and Operations Officer of Clarendon Bank & Trust, and Mr. Schumacher, an Executive Vice-President of Clarendon Bank & Trust, regarding the requisite of two banks and two accounts for a check kiting scheme. Both witnesses have extensive experience in commercial banking. The Court credits their testimony as credible and accepts their expertise in this area. Although defendant objected to their testimony about check kiting, the Court finds their experience sufficient to knowledgeably testify about the elements of check kiting. The Court finds that in its commercial meaning, check kiting refers to the transfer of funds between at least two banks and their respective accounts. This record is without a scintilla of evidence establishing two accounts in different banks.

█ Therefore, the Court finds as a fact and concludes as a matter of law that the instant losses did not occur as a result of any check kiting scheme initiated by Car Retailers or the partnership of Jule Williamson and F. L. Kitzmiller. Furthermore, the Court finds that Section 2(e) of the blanket bond agreement is not applicable to this case. Section 2(e) proscribes recovery for check kiting and in light of the Court's conclusion that this case does not involve check kiting, the exclusion is not relevant. Therefore, the Court finds that the plaintiff may recover under the "false pretenses" proviso of the bond.

Although the Court has concluded that Section 2(e) is not appropriate in this case, the Court is of the opinion that it should address the issue whether, assuming *arguendo,* Section 2(e) is applicable, does it bar recovery? Thus, the Court must decide whether the losses here occurred on the premises.

Defendant has not raised the contention that the crediting of Car Retailers' account amounts to a loan within the terms of Section 2(e) of the bond. De-

---

**2.** The Protective Bulletin employs the following language:

"A check kiting exclusion has been effected by adding the following:"

fendant's primary contention is that payments and withdrawals were not made while a depositor or representative was on the plaintiff's premises and therefore, contravening plaintiff's opportunity to avail themselves of the exception to Section 2(e) exclusions. Defendant succinctly states its position in the following manner:

"It is only when *payment is made* to the depositor or a *withdrawal is made* by the depositor within the office of the Bank that the exception to the exclusion becomes applicable."

Defendant's Post-Trial Brief, 6 (emphasis in original)

The pertinent section of the bond in controversy provides:

" . . . or loss resulting from payments made or withdrawals from any depositor's account by reason of uncollected items of deposit having been credited by the Insured to such account, unless such payments are made, or withdrawn by such depositor or representative of such depositor who is within the office of the Insured at the time of such payment or withdrawal or unless such loss is covered under insuring agreement A."

In the instant matter, Car Retailers, through its personal representative, Mr. Kitzmiller, personally brought large deposits to the plaintiff's office. Mr. Schumacher, an Executive Vice-President of the plaintiff, conferred with Mr. Kitzmiller and perused these deposits to determine whether there was sufficiently geographic and bank diversity. Mr. Schumacher sight posted these checks. It is the plaintiff's assertion that the sight posting by Mr. Schumacher irrevocably committed plaintiff to issue its Treasurer's checks to meet drafts drawn against Car Retailers. These commitments to pay the funds and issue the Treasurer's checks were irreversible and completed within the plaintiff's premises in plaintiff's opinion.

The Court finds plaintiff's argument persuasive. Mr. Schumacher's personal supervision, approval and sight posting of Car Retailers' deposits committed plaintiff to pay these funds. The Court accepts his testimony that the sight posting was an irreversible step. His testimony was uncontradicted and the Court finds it creditable. These commitments were "payments" and "withdrawals" within the terms of the bond. Car Retailers, during Mr. Kitzmiller's physical presence on the plaintiff's premises, received unqualified approval to rely on his deposits. Furthermore, it was confirmed to Mr. Kitzmiller that Treasurer's checks would be issued as a result to these deposits. Defendant counters this conclusion by pointing out that,

"the actual issuance of the Treasurer's checks obviously did not occur when Kitzmiller was on the premises and in some instances did not occur until a day or more following as in the case of the December check for $8,550, on account of which Treasurer's checks were not issued in January. Other Treasurer's checks were dated after January 17 when activity in the account had been terminated."

Defendant's argument addresses the mechanics of issuing of Treasurer's checks. There is no dispute that several and possibly all the Treasurer's checks were physically drawn up when Mr. Kitzmiller was not on the plaintiff's premises. This is merely the mechanical effect of Car Retailers' withdrawal after Mr. Schumacher's sight posting of the deposits. Plaintiff had made the "payments" and "withdrawals" at the time of the meetings of Mr. Schumacher and Mr. Kitzmiller although the technical drafting of the Treasurer's checks had not transpired at this time. The common sense meaning of the exclusion would be vitiated if defendant's interpretation were accepted. Car Retailers transacted its business and secured the appropriate authority for both the payments and withdrawals while Mr. Kitzmiller, a representative of Car Retailers, was in the office of Mr. Schumacher, an officer of the plaintiff. Securing this authority is tantamount to "payments" and "withdrawals" within the terms of the bond.

Therefore, assuming *arguendo* that Section 2(e) is considered relevant, the Court finds that the exception to this exclusion has been met in these circumstances. Specifically, the Court finds that Car Retailers, through Mr. Kitzmiller, made both "payments" and "withdrawals" while he was within the office of the plaintiff.

In summary, plaintiff seeks indemnification for its losses under the theory that Car Retailers' actions constituted both forgery and false pretenses within the terms of the bond. The Court finds that the plaintiff did not establish forgery as a matter of law and, therefore, may not recover under this section of the bond. The Court further finds that the plaintiff is entitled to recover its losses under the section of the bond relating to false pretenses. The Court also finds that Section 2(e) is not relevant to this case and does not foreclose plaintiff's indemnification. Finally, the Court finds that even if Section 2(e) is construed to apply generally, the instant facts meet the "within the office of the Insured" exception to the exclusion thereby permitting recovery.

■ After this finding of coverage for the instant losses, the Court must decide the amount of losses and the appropriate interest. It has been stipulated that the net loss sustained by plaintiff as a result of the dishonors of Richardson's Used Cars, Inc. checks is $307,-812.10. (Stipulation # 12) Plaintiff seeks to recover this sum and interest. An additional complication is the $1,000 deductible provision of the bond. Plaintiff interprets this provision to be applicable once because the entirety of the losses were perpetrated by the same entity in related transactions. Plaintiff supported this interpretation by the testimony of Mr. Moore. He testified that the defendant's past practice in circumstances similar to the instant matter was to treat the loss in a singular fashion. Thus, only the $1,000 amount would be deducted from the plaintiff's loss even though that loss was made up of several transactions. The Court accepts the defendant's previous usage and practice as controlling. Therefore, the Court finds that only $1,000 will be deducted from the amount of the judgment. The Court finds that a judgment of $307,812.10 minus the deductible amount and augmented by the appropriate interest should be entered for the plaintiff.

The sole remaining question is from what time should interest be calculated and what is the appropriate rate. Although the bond does not provide for interest on losses, defendant does not dispute that interest may be assessed on these losses. Section 4 of the bond provides:

"LOSS—NOTICE—PROOF—LEGAL PROCEEDINGS

" . . . This bond is for the use and benefit only of the Insured named in the Declarations and the Underwriter shall not be liable hereunder for loss sustained by anyone other than the Insured unless the Insured, in its sole discretion and at its option, shall include such loss in the Insured's proof of loss. At the earliest practicable moment after discovery of any loss hereunder the Insured shall give the Underwriter written notice thereof and shall also within six months after such discovery furnish to the Underwriter affirmative proof of loss with full particulars. *Legal proceedings for recovery of any loss hereunder shall not be brought prior to the expiration of sixty days after such proof of loss is filed with the Underwriter nor after the expiration of twenty-four months from the discovery of such loss,* except that any action or proceeding to recover hereunder on account of any judgment against the Insured in any suit mentioned in General Agreement D or to recover attorneys' fees paid in any such suit, shall be begun within twenty-four months from the date upon which the judgment in such suit shall become final. If any limitation embodied in this bond is prohibited by any law controlling the construction

hereof, such limitation shall be deemed to be amended so as to be equal to the minimum period of limitation permitted by such law." (emphasis supplied)

 Plaintiff's proof of loss was filed with defendant on August 21, 1974. (Stipulation # 10) According to the provisions of the bond, the plaintiff is prohibited from commencing legal action until sixty days after the proof of loss filing. In *American Insurance Company v. First National Bank in St. Louis,* 409 F.2d 1387 (8th Cir. 1969), it was held in a similar blanket bond that interest did not attach until the conclusion of this sixty (60) day moratorium period provided for in the bond. *American Insurance Company* appears to be the only reported case interpreting Section 4 regarding the commencing date for interest. Absent other authority, the Court will follow the Eighth Circuit's conclusion that interest commences at the end of the sixty (60) day moratorium. Therefore, interest is calculated from October 19, 1974.

The bond does not establish the rate of interest to be paid for the loss of the use of money. Considering .this case has been brought pursuant to the Court's diversity jurisdiction, the Court will apply Virginia law. Absent an express contract to pay interest at a specified rate, Virginia law provides that the legal rate of interest shall be six per centum (6%) from October 19, 1974, to the date of judgment. Under Virginia law, the judgment rate is eight per centum (8%) per annum. § 6.1–330.10 (1950 Code of Virginia, as amended). The plaintiff is, therefore, entitled to eight per centum (8%) from the date this judgment is entered.

Counsel for plaintiff will submit an appropriate Judgment Order within ten (10) days.