477 So.2d 579 (1985)
NCNB NATIONAL BANK OF FLORIDA, a National Banking Association, F/K/a Gulfstream Bank, N.A., Successor by Merger to Gulfstream American Bank and Trust, N.A., Appellant,
v.
The AETNA CASUALTY AND SURETY COMPANY, a Corporation, Appellee.
No. 84-1752.
District Court of Appeal of Florida, Fourth District.
July 17, 1985.
As Clarified August 22, 1985.
*580 Frank J. Sinagra of Britton, Cohen, Cassel, Kaufman & Schantz, P.A., Fort Lauderdale, for appellant.
Diane H. Tutt of Blackwell, Walker, Gray, Powers, Flick & Hoehl, Miami, for appellee.
DOWNEY, Judge.
Appellant, NCNB National Bank of Florida (NCNB), sued appellee, The Aetna Casualty and Surety Company (Aetna), on a bankers blanket bond to recover losses sustained by NCNB as a result of a depositor's check-kiting scheme. From a final judgment in favor of Aetna, NCNB has perfected this appeal.
Alan Gardner maintained three checking accounts and one savings account with NCNB. During 1979 and 1980 approximately $6,000,000 in funds were transferred by Gardner back and forth through a large number of different banks. When the scheme was finally detected NCNB was short $280,000. It appears that Gardner would deposit checks drawn on various banks into his savings account at NCNB. Because of the size of Gardner's accounts, the bank manager, contrary to bank rules, allowed these deposits to be credited to the account without any hold being placed thereon pending collection. After making such deposits, Gardner would withdraw cash, obtain cashier's checks, wire funds out, or deposit the funds into his checking accounts at NCNB. Of the large volume *581 of checks handled in this way, most were paid, but eventually some were not, and the cover was blown on the scheme.
In January 1981 NCNB notified Aetna that it had discovered what appeared to be a check-kiting scheme involving a large loss. It wasn't until June of 1981 that NCNB furnished a proof of loss, which even then Aetna contends was inadequate.
In any event, NCNB made demand upon Aetna under its standard bankers blanket bond, which provided coverage for loss of property through false pretenses, "while the [p]roperty is (or is supposed to be) lodged or deposited within any offices or premises located anywhere." This coverage contained an exclusion for loss resulting from payments made or withdrawals from any depositor's account that had been credited with items of deposit which were uncollected for any reason. This exclusion contained an exception nullifying the exclusion if the payments were made to or withdrawn by the depositor or his representative while within the office of the bank at the time of the payment or withdrawal. An additional exclusion provides that the bond does not cover any loan or transaction in the nature of a loan made by or obtained from the insured.
Aetna refused payment on the bond because 1) the alleged losses were not the type of losses covered by the terms of the bond, 2) the alleged losses were specifically excluded from coverage by the terms of the bond, and 3) NCNB had failed to comply with conditions precedent to a suit on the bond, by failing to make an adequate and timely proof of loss, and because suit was not brought within the time limitation set forth in the bond (twenty-four months from the discovery of the loss).
On appeal, NCNB contends that the bankers blanket bond standard provision covers the type of loss incurred here because it was a loss brought about by false pretenses. It contends further that the uncollected funds exclusion is inapplicable because the loss to NCNB occurred at the time of the deposits into Gardner's savings account, rather than when subsequent withdrawals took place. However, even if the exclusion would otherwise apply, NCNB argues that it is nullified by the exception for on the premises transactions.
Aetna, on the other hand, while conceding this was a check-kiting scheme that resulted in a loss of property through false pretenses, thus bringing the general coverage into play, argues that the uncollected funds exclusion does apply, nullifying the coverage. Furthermore, Aetna contends the exception is not applicable based upon the evidence in the case.
Check-kiting has been defined as "a transfer of funds between two or more banks to obtain unauthorized credit from the bank during the time it takes the checks to clear." Bradley Bank v. Hartford Accident and Indemnity Company, 557 F. Supp. 243, 246 (W.D.Wisc. 1983). The essence of the scheme is described in Clarendon Bank and Trust v. Fidelity and Deposit Co. of Maryland, 406 F. Supp. 1161, 1171 (E.D.Va. 1975), in this manner: "The kite flies as a result of this shifting of funds between two accounts and the gap time between the honoring of other bank's checks." While we believe the scenario described in the case at bar to be check-kiting, it is somewhat unique in that it also involves transfer of money within one bank between a savings and checking account. According to an NCNB bank officer, such transfer carries no "assignment of float."[1] Although NCNB places some weight on this aspect of the case, we do not believe it is consequential because the record indicates that the losses were ultimately incurred as a result of an overall check-kiting scheme. Thus, we are dealing with a loss brought about by false pretenses clearly covered by the Bankers Blanket Bond Insurance Agreement B described above. The more difficult question in this case is *582 the applicability of the exclusion for uncollected funds.
NCNB relies primarily upon the Clarendon Bank case to support its contention that the loss occurred when the items were immediately credited as opposed to the loss occurring during the float period as is typical in a check-kiting scheme. If that conclusion is accurate, it would follow that the uncollected funds exclusion would not apply. However, the mere fact that the bank allowed Gardner to draw immediately upon uncollected funds does not mean this was not a check-kiting scheme. The transactions in the present case were far different than the ones in Clarendon. There, the customer personally presented various items to the bank for deposit. They would be "sight posted" by the bank officer, which irrevocably committed the bank to make payments from the customer's account balance, including the sight posted items. The court held that these commitments were payments and withdrawals within the terms of the bond. However, the issue being focused on in Clarendon vis-a-vis the bank's commitment was the exception to the exclusion nullifying the exclusion if the transaction of payment or withdrawal occurred while the customer was on the premises. The issue was not whether the funds were uncollected so as to bring into play the exclusion itself. Thus, we hold that Clarendon is inapposite and should not be followed here.
Furthermore, the Clarendon loss did not involve check-kiting because the entire scenario there involved only one bank and one account. In the present case, while many of the kites involved transfers from Gardner's NCNB savings account to his NCNB checking account, there were many transactions involving collections through various other banks around the country. It appears to us that the loss incurred here is the result of payments of funds uncollected and uncollectable because, upon presentation for payment to the bank upon which the item was drawn, there were insufficient funds. Therefore, unless the exception for on the premises transactions applies, the uncollected funds exclusion precludes NCNB from recovering on the bond.
We hold the exception for losses occurring on the premises is not applicable here. The support that NCNB envisions in Clarendon is simply inadequate because the factual situation described there is drastically different than what transpired here. We would adopt the critique contained in Bradley Bank, 557 F. Supp. 243, wherein that court, in commenting on the plaintiff's effort to bring itself within the Clarendon holding, said:
This contention has some merit on the surface, but a closer examination of the kind of "commitment" in Clarendon compels this Court to reject plaintiff's argument. In the Court's recitation of the facts, the following description of the procedure which took place with the customer in the bank is found:
[The bank officer] would add up the deposits and would be told by [the customer] what drafts which had been drawn by others on [the customer's account] for its purchases should be paid from the funds so deposited. [The bank officer] would then "sight post" the deposit and would thereby commit [the bank] to pay the drafts selected ...

Id. at 1163. It is this fact which led the Clarendon Court to hold that the customer was present when payments and withdrawals were made. The customer's instructions while present constituted the payments. The bank merely carried out the instructions, albeit at a later time. While the customer was present, the bank was aware of how much it had committed itself vis a vis the deposits.
A different situation is presented here. It is arguable that the plaintiff bank committed itself to honor Schnabel's deposits in general when he personally made the deposits. But specific payments or withdrawals were not enumerated by him at that time, as was the case in Clarendon. It could be argued that the distinction makes no difference when *583 considered in the context of the banking business. But it is clear that it makes a difference under the terms of the Bankers Blanket Bond. The transaction in Clarendon was covered under the bond because specific payments were authorized by the customer while present in the bank at the time of the deposits. In this case, the payments or withdrawals were made at a later time after the customer had left the premises.
557 F. Supp. at 248.
The evidence in the case at bar indicates that there is no direct proof as to which payments or withdrawals were made on or off the premises, and there was no clear showing that Gardner authorized specific payments while on the premises. In any event, the testimony concerning speculation as to on-premises withdrawals against uncollected funds indicates that the amount of such withdrawals was less than the $100,000 deductible in the bond.
As an alternate argument in support of the trial court's judgment in the instant case, Aetna submits that the loan exclusion in the bond applies to preclude coverage. That exclusion provides that the bond does not cover loss resulting from the nonpayment of any loan or transaction in the nature of or amounting to a loan made by or obtained by the insured. Aetna contends that an agreement between NCNB and Gardner reducing the obligation arising out of the resulting overdrafts of his account constitutes a loan transaction because Gardner thereby obligated himself to the bank in return for the bank's agreement to withhold action.
We are not impressed with that argument. First of all, Gardner was already indebted to the bank as a result of the overdrafts of his account. Secondly, as the court in National Bank of Commerce v. Fidelity and Casualty Co., 312 F. Supp. 71, 75 (E.D.La. 1970), aff'd. 437 F.2d 96 (5th Cir.1971), said: "[t]he policy exclusion contemplates a lending transaction knowingly entered into by the bank in reliance on the customer's express agreement to repay, most often for the purpose of making a profit on the interest." The court in Shoals National Bank of Florence v. Home Indemnity Company, 384 F. Supp. 49, 54 (N.D.Ala. 1974) (quoting First National Bank of Decatur v. Insurance Company of North America, 424 F.2d 312 (7th Cir.1970)), put it another way: "It is not conceivable to us that any disinterested banker, insurance underwriter, or lawyer would construe the word `loan', as used in the exclusion clause ... to cover the obligation imposed by law to reimburse a bank for money or credit obtained through the use of worthless checks."
Aetna also refused to pay on the bond because of NCNB's alleged failure to comply with certain conditions precedent to a suit on the bond; however, Aetna apparently concedes on appeal that, with regard to the bringing of suit, NCNB actually had more than twenty-four months to file, by operation of section 95.03, Florida Statutes, and the self-correcting provision of section 4 of the bond. As to the sufficiency of the notice of loss, Aetna maintains that this was a question of fact for the trial court and there is evidence in the record to support a finding that the notice was untimely. Since the trial court made no specific findings of fact in the final judgment, this court must accept the facts to be those shown by that evidence most favorable to the prevailing party. Strong v. Chisolm, 422 So.2d 974 (Fla. 4th DCA 1982); Coble v. Agnew, 128 So.2d 158 (Fla. 2d DCA 1961).
In any event, the judgment appealed from is adequately supported by our holding that the uncollected funds exclusion is applicable, unfettered by the exception argued by NCNB. Accordingly, the judgment is
AFFIRMED.
ANSTEAD and WALDEN, JJ., concur.
NOTES
[1] The period of time during which an amount of money represented by checks outstanding and in process of collection is held by a bank.