FIDELITY & DEPOSIT COMPANY OF MARYLAND (Formerly Clarendon Bank and Trust Company), a Virginia Corporation, Plaintiff,

v.

The BANK OF BLADENBORO, a North Carolina Corporation, Wachovia Bank and Trust Company, N. A., a North Carolina Corporation, the Federal Reserve Bank of Richmond, Virginia, a United States Corporation, and the Federal Reserve Bank of Richmond, Virginia, Charlotte, North Carolina Branch, Defendants,

v.

Jerry RICHARDSON and Charles I. Bridger, Cross-Defendants.

No. 75–0057–CIV–7.

United States District Court, E. D. North Carolina, Wilmington Division.

Feb. 10, 1978.

---

Jerry C. Woodell, Lonnie B. Williams, Marshall, Williams, Gorham & Brawley, Wilmington, N. C., for plaintiff.

William L. Hill, II, Cyrus D. Hogue, Jr., Hogue, Hill, Jones, Nash & Lynch, Wilmington, N. C., for the Bank of Bladenboro and Charles I. Bridger.

Karl W. McGhee, of Stevens, McGhee, Morgan & Lennon, Wilmington, N. C., for Wachovia Bank & Trust Co., N. A.

James C. Fox, of Murchison, Fox & Newton, Wilmington, N. C., for The Federal Reserve Bank of Richmond, Va. and The Federal Reserve Bank of Richmond, Va., Charlotte, North Carolina Branch.

David A. Harlow, of Nance, Collier, Singleton, Kirkman & Herndon, Fayetteville, N. C., for Jerry Richardson.

## MEMORANDUM OPINION AND ORDER

LARKINS, Chief Judge:

In the case of *Clarendon Bank & Trust Company v. Fidelity & Deposit Company of Maryland,* 406 F.Supp. 1161, (E.D.Va.1975), Clarendon Bank & Trust recovered $307,-

812.00 from Fidelity and Deposit (F&D) under the banker's blanket bond issued by F&D for loss sustained by CB&T as a result of allowing Car Retailers to draw on drafts deposited to its account, which deposits were ultimately dishonored. F&D, as subrogee of CB&T in this action seeks to recover the sum it paid out to CB&T from the collecting banks in the collection chain, i. e., The Federal Reserve Bank of Richmond, and its Charlotte, North Carolina Branch, Wachovia Bank and Trust Company, N.A., and the Bank of Blandenboro, alleging that the collecting banks negligently either misrouted, delayed, or caused confusion in the collection process to such an extent that the collecting banks' actions were the proximate cause of CB&T's loss.

This case is before the Court on the various defendants' and Cross-defendants' MOTIONS FOR SUMMARY JUDGMENT. Counsel for all parties have filed briefs and memoranda in support and/or opposition to the various MOTIONS, the Court has carefully reviewed the record and pleadings in this action, and is now ready for ruling.

## I. FACTS

### A. The Financing Schemes

Ronald D. Harmon (Harmon), an employee of CB&T, first met Jules Williamson (Williamson) in 1971; in 1972, after Harmon became the manager of CB&T's Ballston, Virginia branch, Williamson opened a checking account with CB&T and obtained a loan from CB&T via Harmon's assistance. At the time Williamson obtained the loan, Harmon secured a financial statement from Williamson, and also procured a credit report. Williamson's financial statement reflected a net worth of approximately $100,000.00.

On March 31, 1973, Williamson opened a checking account in the name of Car Wholesalers (of which Williamson was the sole proprietor), at the Ballston Branch of CB&T. The name of this account was subsequently changed in June, 1973, to Car Retailers. The initial deposit was approximately $10,000, which constituted Williamson's investment in Car Retailers. F. L. Kitzmiller (Kitzmiller), Car Retailers' employee, dealt with the Bank in making deposits, delivering to CB&T Car Retailers' checks signed by Williamson on the firm's account, and in authorizing payment of drafts drawn on Car Retailers for automobiles purchased by the firm.

Car Retailers was in the business of buying used automobiles at "wholesale" and would in turn sell them to other dealers. When Car Retailers purchased automobiles at an auction, a draft (seller's draft) would be accompanied by title certificates to the purchased automobiles and would be presented to CB&T for payment from Car Retailers' account.

\* \* \* \* \* \*

In 1967 Jerry Richardson (Richardson) started a car business in Bladenboro, North Carolina, under the name Richardson's Used Cars, a sole proprietorship. In 1969 he incorporated the business and its name was changed to Richardson's Used Cars Inc. (RUCI). From the time that Richardson started the business in 1967 and at all times subsequent to 1967, RUCI maintained its checking account with Bank of Bladenboro, Bladenboro, North Carolina. Also, from 1967 and through the times relevant to this lawsuit, Richardson dealt with Charles I. Bridger of the Bank of Bladenboro (Bladenboro).

RUCI began to use a three-part instrument in its business in 1968 or 1969. The Court's examination yields the following description: The top part of the instrument was a blank "draft" (CB&T contends that this was a "check"; this will be discussed later); the second part was a record copy of the draft; and the third part was an envelope into which the titles to vehicles purchased with the drafts were to be inserted and mailed.

This three-part instrument was pre-printed with the old "non-par" routing symbol of the Bank of Bladenboro, 9066—0314, rather than the "par" routing symbol, 0531–0314. This is true of the RUCI drafts which are the subject of this action. The Court takes judicial notice of the fact that on January 1,

1973, the entire state of North Carolina went from a "non-par" to a "par" status, and all banks, including Bladenboro, were required to change the routing symbol imprinted on their checks, etc., from the non-par symbol to the par routing symbol. However there was no fiat from the Federal Reserve System that all supplies then in existence be changed over. In fact, a December 28, 1972 letter from the President of the Federal Reserve Bank to all banks in the Fifth District of the Federal Reserve System, contained the statement that until present check, etc., supplies of the listed banks (including Bladenboro) were exhausted, checks bearing the old nonpar routing symbol could be included in "Cash Letters" presented to the Federal Reserve Banks for payment.

* * * * * *

In July of 1973, Car Retailers worked out a system of financing or "floor planning" its purchases with RUCI. Under the arrangement adopted to implement the course of dealing, RUCI furnished Car Retailers with a large number of the blank instruments described above, i. e., blank drafts drawn by RUCI upon itself, and "collectible through" Blandenboro. The scheme called for Williamson to fill out the drafts for a certain amount, listing on the draft the cars being financed. Williamson would then sign the name of Jerry Richardson, RUCI's President, to the RUCI draft, placing his initials "J.W." by the signature. Car Retailers would then mail the title certificates for the automobiles involved (in the envelope part of the instrument) to Blandenboro so that they could be delivered to RUCI at the time when the RUCI draft was presented to RUCI by Blandenboro for payment. RUCI received a fee for this financing service.

At the time Car Retailers' account was opened at CB&T in March of 1973, it was brought to the attention of Paul Moore (Moore), CB&T's operations officer by CB&T's bookkeeper because the latter knew that Moore had worked with a similar account in the past. Moore was concerned about the account at an early time (June

1973) because of its use of uncollected funds. In the latter part of August or the early part of September 1973, Moore brought the account to the attention of Harmon. Moore advised Harmon that CB&T was advancing monies against uncollected funds and expressed concern over that fact. Also at this time, September 1973, Car Retailers' account started to appear on the overdraft listing at CB&T. Harmon then discussed the problem with Kitzmiller and began to monitor the Car Retailers account because of the overdrafts and the large volume of paper flowing through the account.

In October of 1973 Moore called the account to the attention of Paul. Schumacher (Schumacher), CB&T's Executive Vice-President. In November Moore received a call from Scott Elkins, CB&T's senior loan officer, who, like Schumacher, was concerned about the daily overdraft problem in the Car Retailers account. The Car Retailers account was at this time moved from the Ballston Branch to the Main Office of CB&T. All further deposits were thereafter made at the Main Office. The purpose of moving the account was to "work down" the volume of the transactions, deposits and withdrawals on the Car Retailers account, and to work Car Retailers out of utilizing uncollected funds on its account. In addition, another purpose was to check the diversity (sources) of the various deposits being made to the Car Retailers account.

Concurrently with the foregoing procedures, CB&T began calling Car Retailers during the months of November and December 1973 and January 1974, advising Car Retailers that checks or drafts had been received by CB&T which were payable against the account of Car Retailers but that such items would not be paid until such time as Car Retailers made a deposit to its account. Thereafter, Kitzmiller would call upon Schumacher with a deposit made up of drafts from various sources. Prominent among those drafts, both in number and amount, were RUCI drafts drawn upon itself and collectible through Blandenboro. Schumacher would add up the deposit and

be told by Kitzmiller which sellers' drafts, drawn by others on Car Retailers for its purchases, should be paid from the funds so deposited. Schumacher would then "sight post" the deposit, "OK" and accept Car Retailers' check payable to CB&T in the amount of the sum necessary to pay the sellers' drafts and Schumacher would then deliver to Kitzmiller the automobile certificates of title which had accompanied the sellers' drafts. In light of the case at hand, this transaction is critical. Schumacher would deliver the title certificates to Kitzmiller, and Kitzmiller would mail the titles on to the proper destination. As far as the facts of this case are concerned, CB&T *never* sent the titles to Blandenboro; it was always Car Retailers who did the mailing. This will be most significant later when trying to establish analytically a duty on the part of Bladenboro to notify CB&T of Williamson's terminated agency, and also any duty of Bladenboro to send the titles covered by the dishonored RUCI drafts to CB&T instead of back to Car Retailers' as was done with nearly all of the titles. In exchange for Car Retailers' checks payable to CB&T, CB&T would immediately issue and forward to the sellers CB&T Treasury checks in payment of the sellers' drafts they had received, thereby making payments against uncollected funds on the assumption that Car Retailers' deposits on the same date would be fully collected, and collectible.

CB&T also during this period placed a "hold" upon Car Retailers' deposits in November, the purpose of which was to restrict the use of the items deposited by Car Retailers so that CB&T would be assured that the deposits were physically paid and not returned to the bank uncollected. The period of the hold was ten days. The HOLD WAS NOT LIFTED, BUT ITEMS WERE PAID IN SPITE OF IT, at Schumacher's direction. Schumacher was inexperienced in the realities of the bank's check collection process and had never checked to see how much time was involved in the collection process.

Schumacher called Moore, also in November, and requested that Moore project CB&T's exposure on the Car Retailers account. Moore projected the exposure as five days deposits if such funds were not collected. Car Retailers' average daily collected balance from May 1973 through January 1974 was consistently negative. Car Retailers' bank statement (ledger sheet) at CB&T reflects 45 instances of overdraft between October 1, 1973 and January 21, 1974.

\* \* \* \* \* \*

All went well with this scheme until the automobile business began to slow up. Around December 1, 1973, Bridger telephoned Richardson and told Richardson that the financing arrangement between RUCI and Car Retailers was getting out of hand due to excessive volume. Bridger told Richardson to cut it down (the volume) or cut it out. A few days passed. Richardson called Williamson and advised him that RUCI would no longer "floor plan" or finance Car Retailers' acquisitions. On or about December 15, RUCI advised Car Retailers that it would accept RUCI drafts drawn on RUCI's account pursuant to its financing agreement with Car Retailers through the end of December, but no longer. This notice also cancelled Williamson's authority to sign Richardson's signature on the RUCI drafts after that date.

Richardson did not go to Car Retailers and pick up the unused draft instruments. Incredibly, Williamson continued to sign Richardson's name after the withdrawal of authority, continuing to draw RUCI drafts on RUCI after January 1, 1974. These drafts, the subject of this action, continued to be part of Car Retailers' deposits taken to Schumacher at CB&T by Kitzmiller. Schumacher continued to accept them for deposit and also Car Retailers' checks against those deposits, payable to CB&T, and issuing CB&T Treasury checks to pay the sellers' drafts from these uncollected and uncollectible items.

CB&T did not learn of the withdrawal of Williamson's authority until the middle of January 1974. By that time, over $347,-000.00 in dishonored RUCI drafts had been

sight posted to Car Retailers' account, CB&T had "OK'd" and accepted Car Retailers' checks payable to CB&T drawn against Car Retailers' account for a like sum, and CB&T had issued its Treasury checks to pay the sellers' drafts.

When RUCI refused to honor the drafts in question in this lawsuit, all of which were written after the revocation of Williamson's authority, Bladenboro sent most of the titles back to Car Retailers, from which the Bank had received them. When CB&T finally notified Bladenboro of what was happening, Bladenboro sent the few remaining titles to CB&T. Needless to say, Car Retailers did not turn over the titles to CB&T. Car Retailers was insolvent, the money was nowhere to be found, and CB&T's net loss, after the sale of a few cars, was $317,-812.10.

\* \* \* \* \* \*

B. The Bank Collection Process, January 2 through January 17, 1974, with regard to the RUCI drafts in issue.

CB&T contends that it had experienced no difficulty with previously-deposited RUCI drafts being returned to CB&T unpaid. CB&T also contends that it was not until the RUCI drafts in issue were returned by Bladenboro that problems arose, because by the time CB&T received notice of the return of the RUCI drafts, CB&T had already given value for all RUCI drafts deposited on January 2, January 4, January 7, January 8, January 9, January 10, January 11, January 14 and January 15, 1974, totalling $347,163.00. All RUCI drafts deposited on the foregoing dates were returned by Bladenboro through the collection process marked payment stopped on or after January 17, 1973. The first inkling CB&T had of the problem was January 17, when it received some of the payment stopped drafts which had been deposited by Car Retailers in CB&T January 4 and January 7. This notice was received, therefore, fourteen (14) days, inclusive of the date of deposit and date of notification, from the deposits of January 4, 1973, and sixteen (16) days, inclusive, after the deposits of January 2, which drafts were not returned until well after the twentieth of January.

\* \* \* \* \* \*

With regard to the how and wherefore of this snafu, an examination of the collection process is in order. CB&T, upon receipt, posting and deposit of the RUCI drafts, and pursuant to the directions on the fact of each draft, placed each in a "cash letter" and sent them to the Riggs National Bank (Riggs). Riggs sorted the RUCI drafts in question to a separate pocket in its computer system for "non-par" encoded items, as the RUCI drafts were still encoded with the Old Non-Par routing number of Bladenboro. Because of the non-par routing symbol on each draft, Riggs then sent the drafts in a "cash letter" to Wachovia as that Bank (Wachovia) held itself out to the industry as a specialist in the handling and processing of non-par items.

Upon receipt of the drafts from Riggs, Wachovia processed them and sent them in a "cash letter" to the Federal Reserve Bank of Richmond, Virginia, Charlotte, North Carolina Branch (Fed Charlotte). CB&T contends that this routing by Wachovia of the RUCI drafts to Fed Charlotte was improper, claiming that Wachovia should have instead sent the drafts to Fed Richmond. This contention is without merit. With regard to non-par items there was no distinction between eastern and western North Carolina vis-a-vis routing purposes for handling non-par items. Wachovia handled par items according to the eastern-western distinction, pursuant to Federal Reserve directives; however, each of the RUCI drafts had non-par markings. The Court holds as a matter of law that Wachovia did not misroute the RUCI items.

Once the RUCI drafts reached Fed Charlotte, the time involved in the handling of the items can best be described as chaotic and inconsistent. Some of the RUCI drafts in controversy cleared Fed Charlotte quickly, whereas others took upwards of fifteen days to clear the bank. There is no adequate explanation of this delay in the record, nor does Fed Richmond speak to these delays in its brief. The delays will be further discussed below.

Once the drafts finally cleared Fed Charlotte, they were handled with dispatch by Fed Richmond and forwarded to Bladenboro for collection. Once at Bladenboro, that Bank, pursuant to its instructions from RUCI, presented the drafts for payment. RUCI refused to honor the drafts consistent with its withdrawal of Williamson's authority to sign Richardson's name to the drafts; and Bladenboro, often the same day, sent notice and the draft back to Fed Richmond payment stopped.

As to the speed of notice of dishonor back through proper channels is concerned, to CB&T, this Court has closely examined the record and finds as fact and holds as a matter of law that each Bank responsible for notification back to CB&T did so properly and in due and proper time.

## II. DISCUSSION

### A. NORTH CAROLINA LAW APPLIES TO THE ACTIONS OF ALL BANKS INVOLVED IN THE COLLECTION PROCESS EXCEPT FED RICHMOND.

N.C.G.S. § 25–4–102(2) states:

"(2) The liability of a bank for action or non-action with respect to any item handled by it for purposes of presentment, payment, or collection is governed by the law of the place where the bank is located. In the case of action or non-action by or at a branch or separate office of a bank, its liability is governed by the law of the place where the branch or separate office is located."

### B. THE RUCI INSTRUMENTS DEPOSITED IN CB&T ARE "DRAFTS", NOT CHECKS.

The RUCI instruments CB&T refers to in its pleadings and briefs, identified as Exhibits # 1–42 as "checks", are not "checks", but drafts. Following the Court's examination of these items, which the Court described above, the Court holds that the items were drafts. N.C.G.S. § 25–4–104(3); § 25–3–104(2)(a) and (b). Insofar as the various Banks through which the RUCI drafts were processed for collection are concerned (with the exception of Bladenboro), the distinction attempted to be drawn by CB&T as to the identity of the RUCI items is meritless. As they were sent in "cash letters" and processed like "checks", whether or not CB&T's estoppel argument is valid is not significant. The Court holds that it is without merit; the items were "drafts", and the analysis will proceed from there.

### C. EFFECT OF THE "PAYABLE THROUGH" LANGUAGE ON THE FACT OF THE RUCI DRAFTS.

N.C.G.S. § 25–3–120 states:

"25–3–120. Instruments 'Payable Through' Bank.

An instrument which states that it is 'payable through' a bank or the like designates that bank as a collecting bank to make presentment, but does not of itself authorize the bank to pay the instrument."

The Bank of Bladenboro was not named as the drawee of the drafts, and it was not ordered or even authorized to pay the drafts out of the drawee's account or any other funds of the drawee's in its hands. Bladenboro was not and is not required to take the instrument for collection in the absence of any special requirement or agreement to that effect. In fact, in this case, Bladenboro was instructed by RUCI to present the checks to it for payment, and not to pay the drafts out of RUCI's account at Bladenboro. Bladenboro's only position in the collection process is as a collecting bank through which presentment was properly made to the drawee. Bladenboro is not a "payor bank" for purposes of this lawsuit.

### D. THE USE OF THE NON–PAR ROUTING SYMBOL ON THE RUCI DRAFTS WAS NOT AN IMPROPER ACTION BY BLADENBORO, AS THERE WAS NO RESTRICTION OF THE USE OF THE OLD SUPPLIES BY THE FEDERAL RESERVE UNTIL THEY WERE USED UP.

Bladenboro had no duty at law or by way of Federal Reserve Directive to force RUCI to change the symbol for rout-

ing on its instruments if they were already in existence at the time of the changeover of North Carolina banks from the old non-par to the par system. In fact, the Federal Reserve specifically permitted the "using-up" of old supplies before changing over to newly-printed supplies. Bladenboro would only have violated this directive if it had supplied RUCI with drafts containing the old non-par number *after* January 1, 1973. Further, this Court has questions as to whether Bladenboro, since it had given RUCI notice of the change, was not fully discharged from any duty, save its own care standard with regard to providing new supplies, of forcing RUCI to change over. But that is not the issue before this Court for decision.

Though not being used as a basis for its holding on these MOTIONS, the Court notes in passing that, with regard to the charge that Wachovia misrouted the RUCI drafts to Fed Charlotte and its previous holding that Wachovia did nothing untoward in that respect, CB&T should have noted or at the very least investigated the routing symbols and the ramifications of the non-par symbols in the way of time for processing, as there was obviously concern over the Car Retailers account. In an extended account such as Car Retailers', timing as to payment and collection of items deposited and immediately made available for draw, was critical. CB&T was already aware of its possible "exposure" on the account, was ignoring its own "hold" on deposits, and by January was getting deeper and deeper in trouble by continuing its practices on the Car Retailers account. The foregoing is simply an observation, and is not dispositive of the Court's holding below.

E. CB&T NEVER ESTABLISHED AND NEVER HAD A "SECURITY INTEREST" IN THE CAR TITLES WHICH BLADENBORO SENT BACK TO CAR RETAILERS AFTER DISHONOR OF THE RUCI DRAFTS.

■ CB&T contends that it had a security interest in the car titles which Car Retailers sent to Bladenboro, said contention based on the argument that the titles were "accompanying documents" to the drafts deposited in CB&T by Car Retailers. Basically, CB&T is attempting to establish a duty on the part of Bladenboro thereby to have sent the titles it received from Car Retailers to CB&T upon dishonor of the drafts, rather than to have sent them back to Car Retailers, from whom Bladenboro had received the titles. This argument is without merit. CB&T never had and never established a security interest in the titles, nor were the titles "accompanying documents" as described in N.C.G.S. § 25–4–208. CB&T had a security interest in the drafts themselves, but in nothing else.

F. DUTIES OF THE BANKS IN THE CHAIN OF COLLECTION.

■ N.C.G.S. § 25–4–202, in relevant part, states:

"25–4–202. Responsibility for collection; when action seasonable.

(1) A collecting bank must use ordinary care in

 (a) presenting an item or sending it for presentment; and

 (b) sending notice of dishonor or non-payment or returning an item other than a documentary draft to the bank's transferror or directly to the depositary bank under subsection (2) of § 25–4–212 after learning that the item has not been paid or accepted, as the case may be; and
 * * *

 (e) notifying its transferor of any loss or delay in transit within a reasonable time after discovery thereof.

(3) Subject to subsection (1)(a), a bank is not liable for the insolvency, neglect, misconduct, mistake or default of another bank or person for loss or destruction of an item in transit or in the possession of others."

Fed Richmond, Wachovia, Fed Charlotte, Riggs and [Bank of Bladenboro were all "collecting banks" as defined in N.C.G.S. § 25–4–105(d) Bladenboro was indeed a collecting bank by virtue of N.C.G.S. § 25–3–120 as well as § 25–4–105(d)]. Based on the

facts as listed supra, the Court now holds as a matter of law that Wachovia, Fed Richmond and Bladenboro all satisfied the "ordinary care" requirements of N.C.G.S. § 25–4–202(1), and were not therefore lacking in due care in any fashion regarding the events and items in question in this lawsuit. The Court further finds that each of the above-mentioned banks, save Fed Charlotte, exercised due care in the processing, sending for presentment, handling, and back-notice of stopped payment as it applies to the applicable banks and the RUCI drafts in question.

## G. FED CHARLOTTE'S BREACHES OF ITS N.C.G.S. § 25–4–202(1) DUTY OF ORDINARY CARE.

For purposes of this decision, and also for the sake of practical common sense, the fate of those RUCI drafts deposited in CB&T on January 2, 1974, must be traced. RUCI drafts numbered 3784, 3785 and 3786 were deposited in CB&T on January 2. They were at Riggs on January 3, 1974, and were sent by "cash letter" from Wachovia on January 6 to Fed Charlotte. These 3 items were endorsed by Fed Richmond on January 21, and from there on to Bladenboro and back to CB&T, there was no problem. But the delay at Fed Charlotte on these three items was a period of 15 days, more or less one day. CB&T did not receive notice of the "payment stopped" nature of these drafts until January 24.

■ On the basis of the foregoing facts, the court now holds that, as a matter of law, with regard to the RUCI drafts deposited on January 2, Fed Charlotte failed to exercise ordinary care in two (2) particulars: it did not notify its immediate transferor, Wachovia, of the delay in processing the items; and second, it did not exercise ordinary care in the presentment or sending for presentment of the items for payment. The first of the violations was of N.C.G.S. § 25–4–202(1)(e); the second was of § 25–4–202(1)(a).

\*　　\*　　\*　　\*　　\*　　\*

The principal importance of the January 2 deposits and their delayed presentment is best explained in light of the time involved in the collection process. The Court has examined the route and time involved in the collection and presentment, notice of stopped payment and return notice of dishonor of EACH of the RUCI drafts in issue in this case. It is also clear that the bank collection process, as any other system handling tremendous volume, does not work precisely as planned. But that is not important to the Court except for its gleaning of a working and practical knowledge of the forces involved. What is crucial is the determination of the earliest time that CB&T could have been notified of the stopped payment order in effect from RUCI to Bladenboro. The record reveals that those RUCI drafts deposited in CB&T by Car Retailers on January 4th were all returned to CB&T marked payment stopped or else brought to CB&T's attention as dishonored items on January 17th. Therefore, the period of time which those items took to be returned was 14 days, inclusive of day of deposit and day of return notice. Given the realities of the situation (mails, intervening weekend periods, etc.), and more important, the allowable time provided by the Uniform Commercial Code as a reasonable time each bank in the collection process has in which to process an item, the Court finds as a matter of law that the fourteen day time taken by the January 4th deposits to clear and return to CB&T is a reasonable time under the circumstances, given the number of banks in the collection process and the nature of the items themselves.

The importance of the immediately preceding holding is that the Court will now apply that fourteen day limit to the January 2 deposits. The earliest time by which CB&T could have been notified of the stopped payments on the drafts was January 15th, which is the last day on which RUCI drafts were deposited in CB&T. The Court holds that the 15th is the earliest day on these facts on which CB&T could have learned.

Therefore, given that the result of Fed Charlotte's breach of duty was the failure to send for presentment the January 2nd

deposits so that CB&T did not receive notice within the "reasonable time" of 14 days determined by this Court, it can be reasonably concluded that CB&T took the January 15th deposits and gave credit therefor because of a lack of notice of the nature of the January 2nd deposits. The Court also holds that CB&T could not have known, even given Fed Charlotte's failure to exercise due care, of the nature of the RUCI drafts deposited in CB&T between January 2 and January 14, until the 15th or later in the month.

H. DAMAGES BASED ON RUCI DRAFTS DEPOSITED AT CB&T BETWEEN JANUARY 2 AND JANUARY 14, 1974.

N.C.G.S. § 25–4–103(5) states:

"(5) The measure of damages for failure to exercise ordinary care in handling an item is the amount of the item reduced by an amount which could not have been realized by the use of ordinary care, and where there is bad faith it includes other damages, if any, suffered by the party as a proximate consequence."

In the absence of bad faith the maximum recovery is the amount of the item concerned. When it is established that some part or all of the item could not have been collected even by the use of ordinary care the recovery is reduced by the amount which would have been in any event uncollectible. N.C.G.S. § 25–1–201(19) defines "good faith" as "honesty in fact in the conduct or transaction concerned". The Court holds as a matter of law that there was no bad faith on Fed Charlotte's part in its mishandling of some of the drafts in issue.

When the measure of damages supplied by the North Carolina Uniform Commercial Code is applied to the facts of this case, the Court concludes that CB&T's recovery is zero on the deposits from January 2 through the 14th. The drafts were uncollectible when deposited at CB&T by virtue of Williamson's misdeeds, and there was no way, given the immediate extension of credit on the items by CB&T, that the amounts represented by the drafts would have been collectible. Add to this the fact of Car Retailers' and Williamson's insolvency at the time, and the Court reaches the inescapable conclusion that no recovery is afforded the CB&T by the Code, nor was any action by Fed Charlotte responsible for this loss. Even if Fed Charlotte had exercised due care and ordinary care, CB&T would still have been unable to recover anything on those drafts.

I. DAMAGES BASED ON THE CREDIT EXTENDED BY CB&T ON THE RUCI DRAFTS DEPOSITED ON JANUARY 15, 1974.

Fed Charlotte did not violate N.C.G.S. § 25–4–202(1) in any particular with regard to its handling of the January 15th deposits of RUCI drafts. The North Carolina Uniform Commercial Code makes no provisions for a situation such as the one on the facts of this case: we have a negligent act (the delay in sending for presentment the RUCI drafts deposited January 2nd) which has been held by this Court to have been a cause of the damage incurred by CB&T in extending credit on January 15th to Car Retailers because it had not received notice of the dishonored status of the January 2nd drafts in time. As there was no negligence or failure to exercise due care with respect to the January 15th deposits once at Fed Charlotte, the provisions of § 25–4–103(5) are powerless to instruct the Court on the measure of damages. Given that state of affairs, N.C.G.S. § 25–1–103 states:

"§ 1–103. Supplementary General Principles of Law Applicable.

Unless displaced by the particular provisions of this Act, the principles of law and equity, including the law merchant and the law relative to capacity to contract, principal and agent, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy, or other validating or invalidating cause shall supplement its provisions.

In the Comments to § 1–103, it is stated that the listing given is merely illustrative; no listing can be exhaustive. Given that guidance, the Court holds that North Caro-

lina negligence law applies to the facts remaining to be resolved in this case.

 Fed Charlotte was unquestionably negligent, as its inaction was, along with Williamson's fraud, a cause of the loss suffered by CB&T for funds advanced against uncollected RUCI drafts deposited on January 15th. The only issue remaining in this case is whether CB&T's actions were such as to lead this Court to the conclusion and holding that CB&T was contributorily negligent to the extent that its own negligence could be held to be the proximate cause of its injury for giving immediate credit to the funds represented by RUCI drafts deposited on January 15th, thus insulating Fed Charlotte's negligence.

On the basis of the facts cited by the Court in § I of this opinion FACTS, the Court finds those facts to be a sufficient basis for the support of this conclusion of law: CB&T was so careless, negligent and made so many errors of judgement in the handling of the Car Retailers account that, taken as a whole, the Court cannot choose but to hold that CB&T was contributorily negligent as a matter of law. This negligence was the proximate cause of CB&T's injury notwithstanding the negligence of Fed Charlotte. Although it has been shown to the Court that CB&T ceased crediting RUCI drafts to Car Retailers' account upon notice of dishonor of the January 4th drafts, this in no way overcomes the facts that:

(1) CB&T did not honor its "hold" on the Car Retailers account at all;

(2) CB&T had no dealings with RUCI or its officers; it never ascertained the duration or legitimacy of Williamson's authority to sign Richardson's name to the RUCI drafts;

(3) CB&T knew that the initials "J.W." appearing on the RUCI drafts beside or below Jerry Richardson's "signature" were those of Jules Williamson, CB&T's customer and depositor;

(4) Each RUCI draft was approved by and personally posted by Schumacher, Executive Vice President of CB&T, who knew of the danger of the Car Retailers account and also of the extent of CB&T's exposure should the account turn sour; and who also was studiedly ignorant of the time involved in the bank collection process;

(5) CB&T issued Treasury checks immediately against the uncollected funds represented by the RUCI drafts, and did so consistently for a period of more than two months;

(6) Despite constant monitoring of the Car Retailers account, CB&T never took effective steps to curtail the practices, or limit its "exposure" on the account. The Court can only conclude that the business risk taken was a calculated one which did not pay off.

NOW THEREFORE, IN ACCORDANCE WITH THE FOREGOING, IT IS *ORDERED* THAT THE DEFENDANTS' MOTIONS, AND THE CROSS–DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT BE, AND THE SAME ARE HEREBY GRANTED IN ACCORDANCE WITH THIS MEMORANDUM OPINION AND ORDER; AND IT IS *FURTHER ORDERED* THAT THIS CASE BE, AND THE SAME IS HEREBY *DISMISSED*; AND IT IS *FURTHER ORDERED* THAT THE PLAINTIFF IS TO BEAR THE COSTS OF THIS ACTION; the Clerk is to serve copies of this Memorandum Opinion and Order upon the counsel of record for the parties.

LET THIS ORDER BE ENTERED FORTHWITH.