**BAY AREA BANK, Plaintiff,**

v.

**FIDELITY AND DEPOSIT COMPANY OF MARYLAND, Defendant.**

No. C–84–1642–WWS.

United States District Court, N.D. California.

March 10, 1986.

Daniel J. Lanahan, Law Offices of Ropers, Majeski, Kohn, Bentley & Wagner, San Francisco, Cal., for plaintiff.

Michael B. McGeehon, David E. Bordon, David E. Wood, Sedgwick, Detert, Moran & Arnold, San Francisco, Cal., for defendant.

## MEMORANDUM OF OPINION AND ORDER

SCHWARZER, District Judge.

This is an action to recover under a Bankers Blanket Bond for losses sustained by plaintiff bank when credit card sales drafts proved to be uncollectible. Defendant contends that recovery is barred by the policy rider that excludes losses resulting from withdrawals from a depositor's account which has been credited with uncollected items.

### FACTS

Kevin Flynn entered into a Bank Card Merchant Agreement with plaintiff Bay Area Bank ("the Bank"). Under the agreement, Flynn was authorized to honor certain credit cards and transmit the sales drafts to the Bank for collection. The Bank agreed to post the drafts to Flynn's account immediately upon receipt, without awaiting collection. Flynn could draw checks against the amounts so credited but the Bank retained the right at any time to charge Flynn's account without notice for any sales drafts alleged by the cardholder to have been drawn without authority.

Flynn, under the name of Subscriptions Unlimited, was engaged in the processing of credit card sales drafts in connection with the sale of magazine subscriptions by television advertising. Viewers desiring to purchase subscriptions would telephone a number and authorize the execution of a sales draft covering the subscription price. The sales draft, without the card holder's signature, would be forwarded to Flynn to be deposited with the Bank which then posted the amount to the Subscriptions Unlimited account.

After several months Bank officers became concerned over the large volume of sales drafts that were uncollectible because card holders claimed they were unauthorized. Although Flynn assured them this was the result of some clerical problems which had been corrected, the problem continued. At a meeting between Bank personnel and Flynn in August 1982, Flynn agreed to increase the Bank's security by depositing $50,000 in a separate account and maintaining a minimum balance of $150,000 in the Subscriptions Unlimited account. In return the Bank agreed to continue to post sales drafts immediately on receipt and allow withdrawals from the account. At no time did the Bank exercise its right to terminate the Merchant Agreement.

In September 1982, Flynn deposited a large amount of what turned out to be unauthorized and uncollectible sales drafts. The Bank froze the account and also seized the security deposit to offset the checks drawn on the account and paid. The aggregate of checks paid exceeded the amounts seized, however, by $336,872 which is the amount it now seeks to recover under the Bond.

Unbeknownst to Flynn or the Bank, Subscriptions Unlimited was an unwitting participant in a massive credit card fraud scheme. The participants in the scheme prepared several sales drafts for each person who responded to the television solicitation for magazine subscriptions. These multiple sales drafts would be processed through credit card clearing houses such as Flynn's Subscriptions Unlimited for deposit in that firm's account. The clearing house would then draw the funds out of the ac-

count and forward them to the participants in the scheme, less a five percent commission. Flynn himself was apparently innocent of any fraud.

Plaintiff Bay Area Bank and defendant Fidelity and Deposit Company of Maryland, the issuer of the Bond, have made cross-motions for summary judgment. No facts material to the disposition of these motions are in dispute.

## DISCUSSION

■ The Bond contains several "Insuring Agreements" which insure the Bank against losses caused by a variety of causes, generally summarized as dishonest acts of employees, loss of property, forgery, alteration or counterfeiting. The Bond is subject to an uncollected funds exclusion rider which provides:

1. The Underwriter shall not be liable under the attached bond for:

Loss resulting from payments made or withdrawals from any depositor's account which are uncollected for any reason, including forgery, unless such payments are made to or withdrawn by such depositor or representative of such depositor who is within the office of the Insured at the time of such payment or withdrawal, or unless such loss is covered under Insuring Agreement/Clause (A).[1]

This provision excludes from coverage losses resulting from the extension of credit on uncollected items of deposit. *First National Bank of Miami v. Insurance Co. of North America*, 495 F.2d 519, 522 (5th Cir.1974). Although the exclusion provides that such losses are generally not covered, there is a limited exception for losses resulting from payments or withdrawals made while the depositor is physically present on bank premises. The rationale for the on premises exception is that banks should be encouraged to make arrange-

ments for payment on uncollected items of deposit in face-to-face transactions at bank offices, and coverage is reinstated once a bank has taken this precaution. *See* ABA Tort and Insurance Practice Section, Annotated Bankers Blanket Bond 124 (F. Skillern ed. 1980).

For purposes of these motions only, the parties assume that the Bank's loss would be covered under one of the Insuring Agreements of the Bond. The sole issue presented is whether the uncollected funds exclusion bars coverage of the Bank's loss.

### I. Does the Uncollected Funds Exclusion Apply?

■ The parties do not dispute that the credit card sales drafts presented by Flynn were "uncollected items of deposit" within the meaning of the uncollected funds exclusion. Relying on *Clarendon Bank & Trust v. Fidelity & Deposit Co.*, 406 F.Supp. 1161 (E.D.Va.1975), however, the Bank argues that the exclusion does not apply in this case. Upon a review of historical materials regarding the drafting of this standard provision, the court in *Clarendon* determined that despite its broad language, the uncollected funds exclusion was intended to exclude only losses incurred through check kiting.[2] Since the fraud in *Clarendon* did not amount to a check kiting scheme, the court held that the uncollected funds exclusion did not apply and that the loss was therefore covered under the bond. Accordingly, plaintiff here argues that because the fraud perpetrated upon the Bank was not a check kiting scheme, the uncollected funds exclusion does not apply and the loss is covered.

Plaintiff's argument is not persuasive. Under California law applicable in this diversity action, when the terms of an insurance policy are plain and unambiguous, the courts will not indulge in a forced construction so as to fasten on the insurer liability it has not assumed. *St. Paul Fire & Marine Insurance Co. v. Coss*, 80 Cal.App.3d

---

1. Insuring Agreement/Clause (A) relates solely to employee fraud and is therefore inapplicable.

2. Check kiting generally involves the passing of checks between two or more banks to obtain

unauthorized credit from each bank during the time it takes the checks to clear. *See Bradley Bank v. Hartford Accident and Indemnity Co.*, 557 F.Supp. 243, 246 (W.D.Wisc.1983).

888, 896, 145 Cal.Rptr. 836, 841 (1978); *Russell v. Bankers Life Co.*, 46 Cal.App.3d 405, 42, 120 Cal.Rptr. 627, 631 (1975). Recent decisions interpreting the uncollected funds exclusion have held that its language is unambiguous. *Bradley Bank v. Hartford Accident & Indemnity Co.*, 737 F.2d 657, 660 (7th Cir.1984); *National Bank of Commerce v. Fidelity & Casualty Co.*, 312 F.Supp. 71, 74 (E.D.La.1970), *aff'd,* 437 F.2d 96 (5th Cir.), *cert. denied,* 403 U.S. 906, 91 S.Ct. 2209, 29 L.Ed.2d 682 (1971). By its plain terms, the exclusion applies to losses resulting from "items of deposit which are uncollected for any reason," and is not limited to losses incurred through check kiting.[3] Plaintiff's loss clearly results from payment of items of deposit which were uncollected by reason of a fraud perpetrated on the Bank. Therefore, the uncollected funds exclusion applies and the Bank's loss is excluded from coverage unless the Bank can invoke the on premises exception.

*II. Does the On Premises Exception to the Exclusion Reinstate Coverage in this Case?*

■ The parties do not dispute that Flynn was not physically present in the Bank when actual payment was made on checks drawn against the Subscriptions Unlimited account. Again relying on *Clarendon Bank,* 406 F.Supp. 1170, plaintiff argues that "constructive payment" on these checks was made while Flynn was physically present within the Bank's offices and that the Bank's loss therefore falls within the on premises exception to the exclusion. In *Clarendon,* a used car dealer, Williamson, wrote checks against an account for which his authority had been terminated. He then brought the checks to a bank

where the bank's Vice President personally inspected the checks and approved them for deposit. The Vice President sight posted the deposits, and discussed with Williamson various drafts that would be paid out of the account by issuance of bank treasurer's checks. Williamson then left the bank, and treasurer's checks were later issued against the deposits before the bank was notified that the deposits would be dishonored. The court in *Clarendon* held that the Vice President's personal authorization and sight posting of the deposits irrevocably committed the bank to pay checks drawn against the account. These irrevocable commitments were held to be constructive "payments" and "withdrawals" made while the depositor was on bank premises, and therefore insurance coverage was mandated by the on premises exception.

In this case, plaintiff argues that the Bank's August 1982 agreement to continue to sight post deposits and allow withdrawals on Flynn's account in exchange for greater security irrevocably committed the Bank to pay checks drawn against the credit card sales draft deposits, and therefore constituted "constructive payment" of checks later drawn against the account. Since "payment" was made while Flynn was on Bank premises, the Bank argues that the on premises exception applies and the loss should be covered by the Bond.

Plaintiff's reliance on *Clarendon* is misplaced. Whatever weight one might attach to the *Clarendon* analysis, there is a critical distinction between this case and *Clarendon.* Here the Bank made no irrevocable commitment to pay checks drawn against the depositor's account, and the Seventh Circuit's recent opinion in *Bradley*

---

**3.** Although the *Clarendon* court gave great weight to the fact that a 1969 analysis of the then new exclusion prepared by the Surety Association of America referred to the provision as a "check kiting" exclusion, the Association included an express disclaimer stating that its analysis was intended to be informative only and that "[t]he terms and provisions of this bond and riders will govern any question in connection therewith." *Clarendon,* 406 F.Supp. at 1170 n. 1.

Furthermore, the provision was subsequently amended to exclude losses resulting from items of deposit which are uncollected "for any reason, *including forgery.*" Thus, the language of the exclusion itself, contemplating frauds other than check kiting, now belies any intent that it should apply only to losses incurred through check kiting.

*Bank v. Hartford Accident & Indemnity Co.,* 737 F.2d 657 (7th Cir.1984), is therefore controlling. Construing an identical uncollected funds exclusion, the court in *Bradley Bank* held that the language of the uncollected funds exclusion is unambiguous and that the on premises exception applies only when the customer is physically at the bank at the time of withdrawal. *Bradley Bank* involved a classic check kiting scheme. Like the plaintiff in this case, the defrauded plaintiff bank argued that the bank's standard practice of sight posting customer deposits irrevocably committed it to pay checks drawn against the deposits. The court found the plaintiff's argument to be an unwarranted extension of the rationale in *Clarendon:*

> While the sight posting of deposits in that case created an irrevocable commitment by the bank, here there is no such commitment. The plaintiff concedes that the bank was capable of dishonoring any of the checks. This capability, even if not exercised, precludes us from finding that the plaintiff irrevocably committed itself to making payments. *Id.* at 661.[4]

In this case, not only was the Bank capable of dishonoring checks drawn against Flynn's account, but the account at all times was also subject to the terms of the written Bank·Card Merchant Agreement. Under that Agreement, the Bank expressly reserved the right to debit the account at any time for the amount of unauthorized credit card sales drafts erroneously credited to the account. The Bank further retained the right to cease sight posting and

to terminate the Agreement. Far from creating an irrevocable commitment, the sight postings themselves were expressly revocable under the Agreement. Since Flynn's deposits of credit card sales drafts were at all· times subject to the express terms of the Agreement, the Bank's August 1982 agreement to continue to sight post deposits and allow withdrawals did not constitute an irrevocable commitment to pay checks drawn against the account.[5] Inasmuch as no constructive or actual payments or withdrawals were made while Flynn was within Bank offices, the on premises exception does not reinstate coverage for the bank's loss.

### III. Does California's Concurrent Causation Doctrine Permit Recovery?

As an alternate ground for recovery, plaintiff relies upon the California insurance law doctrine of concurrent causation. Under that doctrine, where two causes operate independently to cause a loss, an exclusion of one cause cannot defeat coverage for the other nonexcluded cause. *State Farm Mutual Automobile Insurance Co. v. Partridge,* 10 Cal.3d 94, 97, 109 Cal.Rptr. 811, 813, 514 P.2d 123, 125 (1973). Plaintiff argues that the uncollected funds exclusion does not apply to losses which would otherwise be covered under Insuring Agreement (B) [loss of property] or Insuring Agreement (E) [counterfeit securities] of the Bankers Blanket Bond. Plaintiff contends that because the bond was intended to cover all types of fraud, the fraud perpetrated upon the Bank by Flynn's Tennessee associates constitutes an indepen-

---

**4.** In affirming the decision of the district court, the Seventh Circuit further distinguished *Clarendon* on the grounds that the *Clarendon* court had characterized the exclusion as a "check kiting" exclusion and that *Bradley Bank,* unlike *Clarendon,* presented a typical check kiting case. This distinction was not dispositive, however, *Bradley Bank,* 737 F.2d at 661, the district court having expressly disclaimed reliance on any interpretation limiting the applicability of the exclusion to check kiting losses. *Bradley Bank v. Hartford Accident & Indemnity Co.,* 557 F.Supp. 243, 248–49 (W.D.Wisc.1983).

**5.** Aside from the Bank's general capability to dishonor checks, as iri *Bradley Bank,* 737 F.2d at

661, and the express terms of the Merchant Agreement in this case, plaintiff's argument simply proves too much. In *Clarendon,* a bank officer made an irrevocable commitment to pay on certain items of deposit which he had personally inspected. In this case, Flynn's deposits were automatically sight posted by bank tellers without further review. To accept plaintiff's argument, one would have to find that the Bank had irrevocably obligated itself to pay on any and all deposits Flynn should present. This argument is belied by standard banking practices and simple common sense. *See Bradley Bank v. Hartford Accident & Indemnity Co.,* 737 F.2d at 661 & n. 6.

dent cause of loss covered by the Bond, notwithstanding the uncollected funds exclusion.

The application of the concurrent cause doctrine necessarily turns on interpretation of the policy. As set forth in *Partridge*, that doctrine simply provides that "coverage under a ... policy is equally available to an insured whenever an *insured* risk constitutes simply *a* concurrent proximate cause of the injury." 10 Cal.3d at 104–05, 109 Cal.Rptr. 811, 514 P.2d 123 (emphasis of insured added). Thus, application of the doctrine is premised on a finding of coverage as to *a* cause, even if other concurrent causes are excluded.

The Insuring Agreement of the Bond issued by defendant states that the Underwriter agrees to indemnify the insured and hold it harmless "subject to the ... Conditions and Limitation and other terms of this bond." The losses insured against include loss of property through false pretenses and losses through counterfeited or forged securities. The attached rider states that

The Underwriter shall not be liable under the attached bond for

Loss resulting from ... withdrawals from any depositor's account which are uncollected for any reason, including forgery, unless such payments are made to or withdrawn by such depositor or representative of such depositor who is within the office of the Insured at the time of such payment or withdrawal, or unless such loss is covered under Insuring Agreement/Clause (A).

The only reasonable interpretation of the Bond is that it is issued subject to the limitation contained in the rider and that the rider applies to all and any losses covered by the Insuring Agreement other than Insuring Agreement (A) (applicable to employees). Accordingly, it specifically excludes losses caused by fraud if the Bank's loss is attributable to the withdrawal of items "uncollected *for any reason.*"

To treat losses through fraud as being attributable to an independent and concurrent cause separate from losses through withdrawal of uncollected funds would be to rewrite the Bond so as to effectively eliminate the rider. Under such an interpretation any loss falling within the insuring agreement would be covered, regardless of the uncollected funds exception which would become a nullity. An insurance policy must be given a reasonable interpretation and the words used are to be given their common, ordinary and customary meaning. *United Services Automobile Association v. Warner*, 64 Cal.App.3d 957, 962, 135 Cal.Rptr. 34, 36 (1976). As stated in *Safeco Insurance Co. v. Gilstrap*, 141 Cal.App.3d 524, 533, 190 Cal.Rptr. 425, 431 (1983), this Court "may not, under the guise of strict construction, rewrite a policy to bind the insurer to a risk it did not contemplate and for which it was not paid." *Id.* The argument advanced by defendant conflicts with those principles.

Common sense, moreover, makes it obvious that the uncollected funds exception does not fall within the scope of the concurrent cause doctrine. Fraud may be practiced on a bank in a variety of ways but, normally, it has no impact until the bank is caused to pay out funds on account of the fraud. But if it chooses to pay out or permit the withdrawal of funds from a depositor's account which are uncollected, it has inflicted the loss upon itself. It is entirely reasonable for the parties to exclude from coverage the loss of funds paid out by the bank at its own risk. Were such coverage not excluded, it could be expected to have a significant effect on premiums.

Thus, the unambiguous terms of the Bond, interpreted in the light of common sense and the reasonable expectations of the parties, *see Holz Rubber Co., Inc. v. American Star Insurance Co.*, 14 Cal.3d 45, 56, 120 Cal.Rptr. 415, 421, 533 P.2d 1055, 1061 (1975), render the concurrent cause doctrine irrelevant in that there is no covered cause.

Inasmuch as the uncollected funds exclusion bars coverage of plaintiff's loss under the Bankers Blanket Bond, defendant's motion for summary judgment must be granted and plaintiff's motion denied.

IT IS SO ORDERED.