533 So.2d 449 (1988)
FIRST UNITED BANK
v.
PHILMONT CORPORATION d/b/a Oakhill Ranch and Country Club and Gary Montgomery.
No. 58933.
Supreme Court of Mississippi.
October 26, 1988.
Rehearing Denied November 30, 1988.
*450 M.D. Tate, II, Smith, Smith, Tate & Cruthird, Picayune, Anson B. Chunn, Chunn & Landrum, James L. Young, C. John Hedglin, Young, Scanlon & Sessums, Jackson, for appellant.
Robin L. Roberts, Lawrence C. Gunn, Jr., Hattiesburg, for appellee.
Before DAN M. LEE, P.J., and ROBERTSON and GRIFFIN, JJ.

I.
ROBERTSON, Justice, for the Court:
This appeal arises from a dispute between a bank and a merchant/customer regarding the actions of the bank in placing a "hold" or "freeze" on the merchant's bank account. After a one-day hearing, the Chancery Court issued an injunction which ordered the bank to allow the merchant access to seventy percent (70%) of the balance of the account.
The law of this case is that, absent agreement to the contrary, a customer may not draw against deposits until the credit given has become final. Because the injunction below fails to honor this principle, we reverse.

*451 II.

A.
Gary Montgomery is the founder, sole shareholder and principal managing officer of Philmont Corporation. The Philmont Corporation in turn owns and is the developer of Oakhill Ranch and Country Club, located near Poplarville, Mississippi. Oakhill is associated with a nationwide system of camping facilities known as Camp Coast to Coast (CCC). CCC caters to owners of recreational vehicles (RVs) by providing a nationwide system of campgrounds open exclusively to members of the organization. There are over 400 campgrounds in all fifty states affiliated with CCC. Membership in a local CCC campground entitles the RV owner entry into any other affiliated campground for the nominal charge of $1.00 per night.
Philmont began this venture when it purchased a horse farm in April of 1984 for $180,000. Philmont spent in excess of $300,000.00 remodeling the farm into an RV campground.
On July 15, 1986, Philmont entered into a VISA/Mastercard Merchant Agreement with First United Bank. First United was a local non-member bank acting as agent for VISA/Mastercard member bank, Trustmark National Bank of Jackson, Mississippi. At the same time Philmont opened two accounts at First United in the name of Oakhill. One of these accounts was a standard business checking account. The other account, the one in controversy, was opened to receive the deposit of VISA/Mastercard sales slips. Philmont could also write checks from this account.
Memberships in Oakhill Ranch sold slowly in the first year of operation. The credit card account at First United reflected an average balance of only a few thousand dollars during this time.
In May, 1987, Montgomery contacted Roy Morris who was connected with a telemarketing service known as Vacation Services, Inc. Vacation Services was engaged in telemarketing memberships in a discount travel club.
Vacation Services and Philmont worked out an agreement that ran something like this: Postcards were sent to Visa and Mastercard cardholders informing them that they had qualified for a "free" trip to Orlando and provided them with an "800" number to find out how to claim their prize. When the customer called Vacation Services' telephone boiler room, located in Jackson, his VISA or Mastercard number would be recorded and the customer was sent an information packet for review. Later, upon the customer's approval and purchase of a membership in the discount travel club, the computers at Vacation Services would generate a VISA or Mastercard sales slip in the name of the customer. The name of Oakhill Ranch appeared as the merchant on these computer-generated slips. Each of these sales were in the amount of $349.00.
Philmont/Oakhill's only tie-in to this marketing scheme was the inclusion of Montgomery's business card in the information packet sent to the customer. The $349.00 purchase also included a one-year trial membership in Oakhill Ranch, although there is no mention of that fact in any of the marketing materials. Montgomery said his intent was to follow-up the leads generated by Vacation Services with Oakhill promotional material, although he had not yet done so and at the hearing was unable to produce any of the contemplated marketing mailings.
For his part in the activities of Vacation Services Montgomery received 23% of the gross sales.[1]
Beginning in the first week of July, 1987, Philmont/Oakhill's credit card account at First United Bank experienced a flurry of activity. Between July 1 and July 14 Philmont presented for deposit nine separate transactions totaling $131,000.00. Each of these nine deposits consisted entirely of the computer-generated sales slips from Vacation Services. Upon examining the account, *452 bank officers learned that Philmont had written checks against these deposits totaling $77,000.00, leaving a balance of $53,000.00. At this time, of course, the items had not yet been paid by the credit card holder.
When all of this happened, Raymond Saucier, the manager of First United's Poplarville branch, opened a batch envelope and attempted to verify a handful of these sales by telephoning the cardholders. Of the seven customers contacted by Saucier, only two acknowledged that they had authorized the use of their credit card for a purchase of a discount travel club membership. Immediately thereafter First United put a hold on the Oakhill credit card account and instructed Montgomery that it was terminating the Merchant Agreement with Philmont. Although Saucier discussed his plan of action with the VISA member bank (Trustmark), he did not consult legal counsel before taking action. In time Trustmark received fifty-one customer protests, amounting to some $17,500.00. As a result of the freeze on the account, thirteen checks were returned to various Philmont/Oakhill creditors marked "uncollected funds".

B.
Philmont and Montgomery commenced this civil action on September 10, 1987, by filing their complaint in the Chancery Court of Pearl River County, Mississippi. First United Bank was named the sole defendant.
Eight days later the Chancery Court entered an order granting Philmont and Montgomery a preliminary injunction. As a preliminary matter the Court found that "the merchant agreement ... does not authorize First United Bank to place a hold or freeze on any funds in the bank accounts of plaintiffs."
The Court enjoined First United Bank from "freezing, withholding, impounding, or in any way preventing Philmont Corporation or Gary Montgomery from withdrawing any funds from the two bank accounts identified in the preceding paragraph and [further] ... enjoined [Bank] from applying charge-backs to either of these accounts on account of credits to Mastercard and Visa charge sales slips."
Finally, the Court ordered that thirty percent (30%) of the funds in the merchant's accounts "may be retained by First United Bank as security pursuant to Rule 65(c), Mississippi Rules of Civil Procedure." The effect of the order of the Chancery Court was to leave a balance of $15,652.86 as security for the repayment of any future charge-backs.
The Bank now appeals to this Court.

III.

A.
The parties have proceeded on the assumption that this is an interlocutory appeal. To that end, they presented to the Chancery Court an agreed order allowing interlocutory appeal pertinent paragraphs of which include:
4... . . All pertinent documentary exhibits are before the court and all testimony germane to the issues involved has been presented at the hearing held on plaintiffs' motion for preliminary injunction.
5. An interlocutory appeal to the Supreme Court will settle the controlling issue in this case and will aid in a speedy and efficient determination of the controlling issue in this case and will avoid expense and delay in this exceptional case.
Reflection makes clear, however, that this is not an appeal interlocutory under former Miss. Code Ann. 11-51-7 (1972) as supplemented by Sonford Products Corp. v. Freels, 495 So.2d 468, 471 (Miss. 1986); Southern Farm Bureau Casualty Ins. Co. v. Holland, 469 So.2d 55, 62-64 (Miss. 1985) (Anderson, J., concurring); and other cases. Rather, this matter lies within Rule 54(b), Miss.R.Civ.P. This is a case where more than one claim for relief has been presented. The Chancery Court has decided the question of law that controls all else in this case. That Court has in effect directed entry of final judgment on a single issue, to-wit:

*453 2. The only issue involved in this appeal, and the controlling legal issue in this case, is whether First United Bank was authorized to take the action recited in Raymond Saucier's letter of July 23, 1987, that is, to place a hold or freeze on any funds in these bank accounts and to refuse to pay checks drawn by the plaintiffs when properly presented.
We will treat the Court's order as a determination that there is no just reason for delay and that this appeal should be heard at this time. See Cox v. Howard, Weil, Labouisse, Friedrichs, Inc., 512 So.2d 897 (Miss. 1987).

B.
During the pendency of this appeal, Philmont Corporation brought a second action which, in part, arose out of these facts and circumstances. This action was brought in the Circuit Court of Hinds County, Mississippi, and named Trustmark National Bank as defendant. Trustmark in turn filed a third-party complaint against First United Bank. We are advised that the Hinds County proceedings have been stayed pending the outcome of this appeal.
In May of 1988, First United Bank moved to dismiss the present appeal. The Bank argues that it runs the risk of conflicting and inconsistent judgments between that finally entered in the case at bar and that which may be entered in the Circuit Court of Hinds County. Philmont and Montgomery, on the other hand, strenuously oppose dismissal, arguing that there has already been a year's delay as a result of the present proceedings and that dismissal would merely put the parties back at square one.
Ordinarily, we would look with favor upon an appellant's motion to dismiss the appeal which it has perfected. Here, such action would merely postpone a decision that ultimately will have to be made. We have before us parties, Philmont and Montgomery, who press a legitimate demand that the issues tendered be finally resolved. First United's motion is tactical, in no sense suggesting that there is no longer need for judicial resolution of the issue here tendered. While quite arguably due process considerations would preclude Trustmark being bound by any final adjudication in this action, the operation of stare decisis, if nothing else, should lead to final disposition of the ultimate issue once today's opinion becomes final.

IV.

A.
Our bottom line question is whether First United Bank has in law the authority to place what it describes as an administrative freeze on Philmont's account. The Bank argues that the law by reference to which we answer this question is the Merchant Agreement of July 15, 1987. Philmont responds that the matter is controlled by Article 4 of the Uniform Commercial Code, as enacted in this state. Miss. Code Ann. 75-4-101, et seq. (1972). Both are right.
Credit card sales slips are not checks, drafts or other negotiable instruments as defined by UCC Articles 3 and 4.
5 Anderson, The Uniform Commercial Code, 3-104:17 (1984). The sales slips do, however, qualify as "items". An item is "any instrument for the payment of money even though it is not negotiable but does not include money". Miss. Code Ann. 75-4-104(1)(g) (1972). The sales slips are non-negotiable instruments evidencing the payment of money and they are treated as such under the terms of the Merchant Agreement.
As these sales slips are items within the meaning of Article 4, then the defendant bank is a "depositary bank" and "collecting bank" for the purpose of further Code analysis. Miss. Code Ann. 75-4-105(a) (1972) ("Depositary Bank means the first bank to which an item is transferred for collection"); Miss. Code Ann. 75-4-105(d) (1972) ("Collecting Bank means any bank handling the item for collection").
We hold the transactions at issue in this case effectively controlled by Article 4 of the Mississippi UCC. The First United Bank was acting as a depositary bank in all *454 of its dealings with Philmont Corporation, provisionally crediting Philmont's account upon the deposit of the credit card sales slips. Trustmark was functioning as a clearinghouse for these items, forwarding the slips to other member banks for ultimate collection.
That a transaction falls within Article 4, however, does not necessarily lead to a mechanical application of Code law. The UCC empowers parties to commercial transactions to vary by agreement the Code provisions in many significant ways:
(1) The effect of the provisions of this chapter may be varied by agreement except that no agreement can disclaim a bank's responsibility for its own lack of good faith or failure to exercise ordinary care or can limit the measure of damages for such lack or failure; but the parties may by agreement determine the standards by which such responsibility is to be measured if such standards are not manifestly unreasonable.
(2) Federal Reserve regulations and operating letters, clearinghouse rules, and the like, have the effect of agreements under subsection (1), whether or not specifically assented to by all parties interested in items handled.

Miss. Code Ann. 75-4-103 (1972) (emphasis added).
Various agreements and clearing-house rules, elements of private law which depart from the terms of Article 4, are to be found in the record in this case. As the above-quoted language states, the parties to a VISA Merchant Agreement can be bound by the VISA Operating Regulations (which have the effect of clearinghouse rules).[2] Additionally, these rules may be enforced against all participants in the collection system "whether or not specifically assented to" by these parties.
So in response to the original question "what law controls?", and with reference to the positions defined by the parties, our answer may be so framed:
The law which defines the rights and obligations of these parties and controls the resolution of this case is composed of:
(1) Article 4 of the Uniform Commercial Code as enacted in this state; supplanted by
(2) the Merchant Agreement, insofar as it varies the provisions of Article 4, and is not manifestly unreasonable; and
(3) the VISA Operating Regulations (clearinghouse rules), insofar as they *455 vary the provisions of Article 4, and are not manifestly unreasonable.

B.
The question of the Bank's rights to place an administrative freeze of Philmont's account turns upon whether Philmont could withdraw the balance represented by the VISA sales slips "as of right". We answer this question by reference to the controlling public law, supplemented by private law as above.
Of consequence is the following language of UCC Section 4-213:
(3) If a collecting bank receives a settlement for an item which is or becomes final ... the bank is accountable to its customer for the amount of the item and any provisional credit given for the item in an account with its customer becomes final.

(4) Subject to any right of the bank to apply the credit to an obligation of the customer, credit given by a bank for an item in an account with its customer becomes available for withdrawal as of right
(a) in any case where the bank has received a provisional settlement for the item,  when such settlement becomes final and the bank has had a reasonable time to learn that the settlement is final;
-Miss. Code Ann. 75-4-213 (1972) (emphasis added).
Philmont could not, therefore, of right demand that the Bank honor checks drawn against the deposit of credit card sales slips until the Bank's provisional credit of the account became final.
The Bank's right to charge-back against Philmont's account is also affected by the point when a provisional payment becomes final. UCC Section 4-212 provides:
(1) If a collecting bank has made provisional settlement with its customer and itself fails by reason of dishonor, suspension of payments by a bank or otherwise to receive a settlement for the item which is or becomes final, the bank may revoke the settlement given by it, charge-back the amount of any credit given for the item to its customer's account or obtain refund from its customer ... These rights to revoke, charge-back, and obtain refund terminate if and when a settlement for the item received by the bank is or becomes final ...
 Miss. Code Ann. § 75-4-212(1) (1972) (emphasis added).
The bank, therefore, has authority to refuse to honor checks drawn against credits in a customer's account so long as those credits remain provisional and the bank retains rights of charge-back or refund. The bank must, however, act in good faith. In re Williams, 61 B.R. 567, 573 (Bankr.N.D.Tex. 1986).
Miss. Code Ann. § 75-4-213 (1972), in relevant part, declares that a credit to a customer's account has become final when the bank: ... (b) settles for the item without reserving a right to revoke the settlement and without having such right under statute, clearinghouse rule or agreement; ... or (d) provisionally credits the customers account and fails to revoke the provisional credit in the time and manner permitted by statute, clearinghouse rule or agreement.
Here the Merchant Agreement and the VISA operating regulations are at substantial variance with Article 4 with regard to the time at which the provisional credit given by the member bank to non-member banks and customers becomes final. Significantly, they give the member bank a 120-day right of charge back. The UCC's three day charge back rule, Miss. Code Ann. § 75-4-213(4)(b) (1972),[3] is wholly supplanted.
The Merchant Agreement reserves to the Bank the right to charge-back against the merchant's account any disputed charges in accordance with the operating regulations. Merchant Agreement § 11. In addition the agreement states:

General. Merchant will: ... (b) observe and comply with the Master Charge  The Interbank Card System's and/or the *456 Visa U.S.A. Inc. Card System's applicable Rules and Regulations and such procedures as Bank or System may prescribe for Charge Card Sales, Pre-Charge Card Sales, Sales Slips and Credit Slips; ...
 Merchant Agreement § 17. The use of such language in the Merchant Agreement effectively incorporates the VISA Operating Regulations into the contract as permitted by Miss. Code Ann. § 75-4-103(2) (1972). Regulation 2.11.4 of the manual states:
The following circumstances shall give rise to a Charge-back right which may be exercised up to a maximum of 120 calendar days from the Endorsement Date: 2.11.4.1 Cardholder Disputes Paper 
 Issuer receives a written complaint from its Cardholder who acknowledges participation in the Transaction, but states that, for a given reason, the Cardholder requested an adjustment and Credit Voucher from the Merchant and was refused.
 Issuer receives a written complaint from its Cardholder who acknowledges participation in the Transaction and states that the Transaction was in violation of law, or the goods, services, or other thing of value described on the Paper were not received by such Cardholder or by a person authorized by him.
 VISA U.S.A. Inc. Operating Regulation 2.11.4. The Merchant Agreement and the Operating Regulations therefore reserve the right to charge-back to the merchants account any disputed sales within 120 days after the transaction took place.
In attempting to harmonize the provisions of Article 4 and these same provisions of the Merchant Agreement and Regulations, the court in In Re Twenty-four Hour Nautilus Swim & Fitness Center, 81 B.R. 71 (D.Colo. 1987), stated:
I agree with the appellee bank that here the agreement between the debtor, the appellee [merchant] and VISA defined the time and manner in which a provisional settlement of the Visa items would become final. The agreement created the right to revoke the settlement upon dispute by a customer and for other reasons. The official comment to [UCC 4-213] provides that "[i]f under a statute, clearinghouse rule or agreement, a right of revocation of the settlement exists, the settlement is provisional."
 In re Twenty-four Hour Nautilus, 81 B.R. at 73-74.
Philmont argues that the past practice of the Bank in sight posting deposits consisting of credit card sales slips and allowing Philmont to draw against the uncollected funds is a commitment to pay checks drawn in the same manner in the future. But this is not so. First United's "freeze" was nothing more than a suspension of a previously extended courtesy. Absent agreement to the contrary  a matter not present here, a bank has no obligation to honor checks drawn against credits that have not become final.
Addressing this same argument, the court in Bay Area Bank v. Fidelity & Deposit Co. of Maryland, 629 F. Supp. 693 (N.D.Cal. 1986), stated:
In this case, not only was the Bank capable of dishonoring checks drawn against Flynn's account, but the account at all times was also subject to the terms of the written Bank Card Merchant Agreement. Under that Agreement, the Bank expressly reserved the right to debit the account at any time for the amount of unauthorized credit card sales drafts erroneously credited to the account. The Bank further retained the right to cease sight posting and to terminate the Agreement. Far from creating an irrevocable commitment, the sight postings themselves were expressly revocable under the Agreement.
 Bay Area Bank, 629 F. Supp. at 697. The court went on to say that "[t]o accept plaintiff's argument, one would have to find that the Bank had irrevocably obligated itself to pay on any and all deposits Flynn should present. This argument is belied by standard banking practice and simple common sense." 629 F. Supp. at 697 n. 5. Other courts have reasoned that by allowing a customer to write checks against uncollected funds a bank does not *457 waive prospectively the right to dishonor such checks. Discount Auto Mart v. Bank of North Carolina, 263 S.E.2d 41 (N.C. App. 1980).
We must consider, of course, whether the enlargement of the normal three-day period to 120-days is manifestly unreasonable within Miss. Code Ann. 75-4-103(1) (1972). Bottom-line policy considerations favor the Bank's position here. Abuse of merchant accounts by drawing against uncollected sales slips has led to substantial losses suffered by banks in recent years. The bank in Watson v. State, 521 So.2d 1290 (Miss. 1988), was left with $70,000.00 in charge-backs against a $20,000.00 balance. Losses sustained by the bank in Bay Area Bank, above, attributable to uncollectible credit card sales slips exceeded $300,000.00. 629 F. Supp. at 694. The recent case of Fogel v. White, 745 S.W.2d 444 (Tex.Civ.App. 1988), involving a business venture identical to that of Vacation Services, states only that "the discrepancy between the amount in consumer charge-backs and the balance remaining in the provisional credit account became very large ..." 745 S.W.2d at 445.
The potential for loss is further enhanced if, for instance, the merchant should engraft a kiting scheme onto the credit card "float".[4]
In any event, present commercial law is of sufficient flexibility to allow the merchant ready access to the capital generated by credit card sales. The Merchant Agreement already grants the bank the option to request an Article 9 security agreement and financing statement to protect its interests. Merchant Agreement § 17. New ventures, through the use of existing commercial devices, could therefore gain ready access to the provisional credits.
Ultimately, neither Article 4 nor any theory of waiver can grant to Philmont's deposit and account credit the finality necessary for Philmont to claim a withdrawal against these deposits "as of right." Since Philmont's deposits of the credit card sales slips were at all times provisionally credited to the account, the Bank was under no duty to make these funds available to the depositor. They, therefore, acted fully within their legal rights by informing Montgomery to cease drawing against the account and by dishonoring checks so drawn.
Of course, Philmont has (and had) the right to draw against any credits which had become final, or which subsequently became final. See Miss. Code Ann. § 75-4-213 (1972). In this sense the term "freeze" is a misnomer. First United has never had any authority in law to place a permanent freeze on Philmont's account. What  and all  the Bank has ever had authority to do is to withhold honoring checks drawn against credits in Philmont's account until those credits have become final.
We reverse and remand for further proceedings consistent with this opinion.
REVERSED AND REMANDED.
ROY NOBLE LEE, C.J., HAWKINS and DAN M. LEE, P.JJ., and PRATHER, SULLIVAN, GRIFFIN and ZUCCARO, JJ., concur.
ANDERSON, J., not participating.
NOTES
[1] Editorially, Montgomery was probably receiving 23% of gross for acting as Vacation Services' "billing agent". For a discussion of this relationship, see Watson v. State, 521 So.2d 1290 (Miss. 1988).
[2] This appeal is centered upon the rights and duties of banks and merchants participating in the nationwide system of bank credit card collection; specifically VISA/Mastercard. An overview of this collection system  as reflected by the record  will be helpful.

At the center of the credit card collection system is the "member bank". These are the banks which are authorized by VISA/Mastercard to issue credit cards. At the same time, these member banks also act as clearinghouses for the collection of credit card sales slips within a defined geographic area. The member banks in turn recruit "non-member banks" to act as local agents and as points of collection for credit card sales slips.
The non-member banks enter into agreements with local merchants whereby the merchants honor the VISA and/or Mastercard credit cards at their places of business and the bank agrees to accept an "assignment" of all sales slips. Frequently, the merchant will open an account at a local participating bank for the purpose of posting and processing these credit card sales slips, although this is not required by the merchant agreement.
If the merchant chooses not to maintain an account at any participating bank, the member bank agrees to pay the merchant by check no later than thirty days after presentation of the sales slips. Merchant Agreement 11. If, however, the merchant has such an account with the non-member bank, the merchant's deposit of these credit card sales slips is very similar to a deposit of personal checks.
The sales slips are deposited in a sealed envelope with a cellophane window through which can be seen a "batch header" card displaying the total number and total amount of the receipts contained in the envelope (or batch). Once these sales slips are deposited, the local participating bank provisionally credits the merchant's account and forwards the batch to the local member bank. The member bank then opens the envelope and processes the batch by sending each sales slip to the bank which issued the credit card used in the sales transaction. Each member bank can then assemble a monthly statement for each of its customers.
The card system's regulations provide the customer with a 120-day period in which to contest any charge appearing on a monthly statement. If contested, a "charge-back" is sent back through the collection system and is ultimately the responsibility of the merchant.
[3] Because First United was acting as an agent of Trustmark for purposes of credit card receipt collection, it was acting as both a collecting and payor bank. Thus, Section 4-213(4)(b) would otherwise apply.
[4] In this case that possibility may rise to more than speculation. After First United froze Philmont's account, Montgomery offered to deposit a $30,000.00 check into the account as security. Given Montgomery's testimony regarding his poverty caused by the freeze, one can only assume that he intended to obtain the $30,000.00 from another merchant account he had opened at Trustmark (which at the time consisted of $37,000.00 in uncollected sales slips generated by Vacation Services!).